THE WYOMISSING.

THE BERN.

(Circuit Court of Appeals, Second Circuit.   November 9, 1915.)

No. 12.

TOWAGE ☞11—STRANDING OF TOW—LIABILITY OF TUG.

That a coal-laden scow forming part of a tow was leaking, thus increasing its draft as it proceeded, which fact was known to the tugs, did not relieve the tugs, in towing over a well-known and constantly used course, from the duty of keeping the scow in sufficient depth of water, and they are liable for the sinking of the scow as the result of striking a rock in the channel, in the absence of proof that the rock was an unknown obstruction.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. ☞11.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Thomas J. Howard and others against the steam tugs Wyomissing and Bern; the Philadelphia & Reading Railway Company, claimant. Decree for claimant, and libelants appeal. Reversed.

Herbert Green, of New York City, for appellants.

Armstrong, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

WARD, Circuit Judge. Appeal from decree dismissing libel for negligent towage. October 20, 1913, between 9 and 10 p. m., the tugs Wyomissing and Bern, belonging to the Philadelphia & Reading Railway Company, left Port Reading with a flotilla of coal-laden boats, consisting of six tiers of four boats each. The scow Van Winkle, outside boat on the starboard side in the fifth tier, was carrying 1,372 tons of coal, giving her a draft of 14 feet. The railway company's dockmaster at Port Reading knew that the scow was leaking when he put her in the tow, and indeed had received a message from the main office to do so. About 6 a. m. the next morning, at low water, the scow ran upon a rock or boulder, which made a hole in her square bow some 2 or 3 feet above her bottom. She sank with her bow projecting above the surface and her stern entirely submerged, and there was from 19 to 24 feet of water at different points around her.

The District Judge dismissed the libel, saying among other things:

"At the same time the evidence satisfies the court that at the point where the barge was sunk at mean low water there could not have been less than 14 feet 6 inches of water in depth, even giving to the libelants' testimony all the effect claimed for it. Now the evidence is that the bow of the barge showed signs of forcible impact against and contact with rocks to a distance of 2 to 3 feet above the bottom of the barge; that is, when the barge struck, her bow must have struck an obstruction which reached up 2½ feet higher

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

than the bottom of the barge. Thus, if the barge was only drawing a normal draught of 14 feet, the barge must have struck with her bow against an obstruction or shoal of a rocky character which rose up 2½ feet higher; so that, if the minimum low water was 14 feet 6 inches at that point over the higher obstruction struck by the bow, the barge at that time must have been drawing near 17 feet. * * *

"Testing the barge master's testimony by the circumstances of the case, the conclusion follows that he was mistaken if and when he sounded on the morning of the 21st he thought he found only 12 inches of water in the bottom of the barge. The evidence is he had gone to bed exhausted by a hard day's pumping, had slept for several hours, and waked that morning and sounded for the depth of water in the barge. And inasmuch as the soundings noticed by him are wholly irreconcilable with the circumstances of the case, the conclusion is that he was mistaken, and that the only way to account for the barge's striking as she did is by the explanation that she had been leaking all night, that her draft had increased from the normal of 14 feet to something in the neighborhood of 17 feet, and that striking on the bottom at 17 feet or over she was dragged until the bow encountered a slightly higher part of the shoal rising some 2 to 2½ feet up against which the bow struck, in consequence of which blow the planks of the bow were crushed in, and up over which the bow of the barge was dragged, so as to give it the uplifted appearance it had after the barge finally sank. The sinking, therefore, was due, not to the fact that the barge was towed out of the proper channel, or over a place which at its normal draught would not have been wholly and entirely safe for it to be towed at that stage of the tide, but was due to the greater and abnormal draught caused by an unseaworthy condition;" that is, a leakage, and for which the towing company respondents would not be responsible."

We think on these facts the libel should not have been dismissed. The proofs show that the scow when fully loaded drew 17 feet, which therefore was not an abnormal draft. There was no representation as to her draft made to the railway company, and it knew that her actual draft was liable to be increased on the trip, because she was leaking. The libelant was entitled to have his scow safely towed at any draft she could stand, whether due to cargo or to a leak. Of course, if she had foundered, as the answer alleges, because of the leak, the tug would not be responsible; but it is clear that she sank as the result of striking on the rock.

When a tug strands a tow on a well-known and constantly frequented course, she is bound to explain the accident. The Ellen McGovern (D. C.) 27 Fed. 868. If the tow strikes a rock in the channel, as the District Judge found in this case, the claimant is bound to show that the rock was an unknown obstruction. The Mary N. Hogan (D. C.) 30 Fed. 927; The Pierrepont (D. C.) 42 Fed. 687. As it has failed to do this, the decree is reversed, and the court below directed to enter the usual interlocutory decree in favor of the libelants.