366 F.2d 699
 UNITED STATES of America, Appellant,
v.
Dewey SORIANO, Appellee.
PETITION of AMERICAN MAIL LINE LTD., a corporation, owner
pro hac vice of the AMERICAN OIL SCREW ISLAND
MALL, Official No. 421157, for
exoneration of liability et al.
UNITED PACIFIC INSURANCE COMPANY et al., Appellants,
v.
UNITED STATES of America, Appellee.
 Nos. 20266, 20129, 20130.
 United States Court of Appeals Ninth Circuit.
 Sept. 27, 1966, Rehearing Denied in Nos. 20266, 20130, Nov. 8, 1966.
 
 Wm. N. Goodwin, U.S. Atty., Seattle, Wash., John F. Meadows, Atty. in Charge, Henry Haugen, Sp. Atty., Admiralty & Shipping Sec., Dept. of Justice, San Francisco, Cal., for the United States.
 Lane, Powell, Moss & Miller, Jones, Grey, Kehoe, Hooper & Olsen, Martin P. Detels, Jr., Harry B. Jones, Jr., Seattle, Wash., Joseph J. Magrath, Bigham, Englar, Jones & Houston, New York City, for appellants United Pacific Ins. Co. and others.
 Charles B. Howard, Richard W. Buchanan, Summers, Howard & LeGros, Seattle, Wash., for appellee, Dewey Soriano.
 Stanley B. Long, Edward C. Biele, Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for appellee, american Mail Line Ltd.
 Before HAMLEY and JERTBERG, Circuit Judges, and THOMPSON, District judge.
 HAMLEY, Circuit Judge:
 
 
 1
 The above-entitled cases, consolidated for trial and appeal, are part of the extensive litigation spawned by a marine casualty which occurred on May 29, 1961. On the afternoon of that day the cargo vessel M/V ISLAND MAIL was proceeding north through Puget Sound and the eastern portion of the Straits of Juan de Fuca, en route from Seattle to Bellingham, Washington. The vessel struck a submerged and uncharted rock west of Smith Island, in the Straits of Juan de Fuca. Substantial damage to the hull and cargo was sustained.
 
 
 2
 Certain subrogated cargo underwriters (Private Cargo) filed a libel against the United States, seeking recovery for loss and damage to their cargo. District court jurisdiction was asserted under section 2 of the Suits in Admiralty Act, 41 Stat. 525 (1920), as amended, 46 U.S.C. 742 (1964), and under the Federal Tort Claims Act, 62 Stat. 933 and 982 (1948), 28 U.S.C. 1346(b), 2671 et seq. (1964). The district court, after trial, dismissed the libel with prejudice and Private Cargo appeals. The case was docketed here as United Pacific Insurance Company, et al. v. United States, No. 20130, and will be referred to herein as the Private Cargo-Government case.
 
 
 3
 American Mail Line, Ltd., (Mail Line), bareboat charterer of the ISLAND MAIL, filed a petition for exoneration from or limitation of liability under Rev.Stat. 4285 (1875), 46 U.S.C. 185 (1964). Private Cargo filed claims in that proceeding for loss and damage to their cargo. The aggregate of all claims did not approach the limitation fund. The district court therefore regarded Mail Line's petition for exoneration from or limitation of liability as moot.
 
 
 4
 The court treated all claims against Mail Line as ordinary libels for cargo damage, and after trial, dismissed the libels with prejudice. Private Cargo appeals. The case was docketed as In the Matter of the Petition of American Mail Line, Ltd., etc., No. 20129, and will be referred to herein as the Private Cargo-Mail Line case.
 
 
 5
 The United States filed a libel in personam against Dewey Soriano, pilot of the ISLAND MAIL at the time of the casualty, to recover for damage to its cargo on board the ISLAND MAIL. District court jurisdiction was asserted under 28 U.S.C. 1333(1) (1964). The district court, after trial, dismissed the libel with prejudice and the United States appeals. The case was docketed here as United States v. Soriano, No. 20266, and will be referred to herein as the Government-Soriano case.
 
 
 6
 While there is some overlapping of issues, the questions raised on these three appeals can be conveniently discussed under the heading of the appeal to which they primarily relate.
 
 Private Cargo-Government Case
 
 7
 The submerged rock which the ISLAND MAIL struck on May 29, 1961, was not shown on any Government chart, nor had the Government taken any other means of advising mariners that a rock was located at the place where the ISLAND MAIL casualty occurred. The theory of Private Cargo's case against the Government is that the Government should have charted this rock previous to the ISLAND MAIL casualty and otherwise warned mariners of its presence. Private Cargo asserts that, instead, the Government made inaccurate notations on its charts, and otherwise inaccurately warned mariners that wreckage had been encountered some distance away from the rock which the ISLAND MAIL struck.
 
 
 8
 Private Cargo's theory is predicated on the fact, stipulated by it and the Government, that the ISLAND MAIL struck a rock at approximately 48 degrees 19.35' North Latitude, 122 degrees 53.3' West Longitude. The trial court so found on the basis of that stipulation, describing this obstruction as the 3.5 rock.[1]
 
 
 9
 According to Private Cargo, the Government had long known, or in the exercise of reasonable care should have known, that another vessel, the SS CHARLES CROCKER, struck this same submerged rock on June 18, 1952. Private Cargo asserts that the Government failed to give mariners prompt notice of this fact by chart notations and otherwise. Instead, the Government published a notice that 'sunken wreckage has been reported in 48 degrees 19' 32' N., 122 degrees 53.40" W.,' and placed a symbol, 'Wreckage Rep. 1952,' on Coast and Geodetic Survey Charts of the Smith Island area, together with a small circle, tinted on some charts.
 
 
 10
 Private Cargo contends that the circle on the charts indicating a danger area was centered over seven hundred feet from the reported position of the CROCKER at the time of its casualty, and an accurate representation of the reported position would have centered the wreckage notation only eight hundred feet west of the 3.5 rock. In addition, Private Cargo states that had the Government made a reasonable search after receiving the report of the CROCKER casualty it would have found that the rock struck by the CROCKER was the 3.5 rock and could have reported its exact location. Moreover, the Government gave no warning that the reported object was a danger to surface navigation or that it had been struck by a vessel having a mean draft of twenty-one feet eleven inches.
 
 
 11
 The trial court did not find that the Government had been negligent in all the particulars contended for by Private Cargo. It did, however, find that the Government had been negligent in failing to disseminate information obtained from Captain Dexter Flint of the CROCKER, conveyed by his letter of July 7, 1952. In that letter statements were made concerning the location of the submerged object which the CROCKER struck, and the depth of the water in that vicinity. The trial court also found that the Government had been negligent in failing to disseminate approved conclusions reached by a Coast Guard investigating officer.
 
 
 12
 The trial court further found, however, that the Government's negligence was not a proximate cause of the ISLAND MAIL casualty. The court therefore dismissed Private Cargo's libel against the Government.
 
 
 13
 The court gave two reasons for finding that the Government's negligence was not a proximate cause of the ISLAND MAIL casualty. One reason was that the CROCKER did not strike the 3.5 rock, and therefore the charting of the rock which the CROCKER struck could not have saved the ISLAND MAIL from striking the 3.5 rock. In support of this reason the trial court expressed the view that: (1) there was too much water over the 3.5 rock at the time of the CROCKER casualty to make such a collision possible; and (2) the rock which the CROCKER struck was in the general area .27 miles east of the 3.5 rock.
 
 
 14
 The second reason relied upon by the trial court in finding that the Government's negligence was not a proximate cause of the ISLAND MAIL casualty was that the sole proximate cause was the negligence of Pilot Soriano in permitting the ISLAND MAIL to penetrate the so-called ten-fathom curve around Smith Island within which the 3.5 rock was located.[2] The area within this curve, tinted blue on Government charts, has a depth of less than ten fathoms. The trial court found that the ten-fathom curve in that particular area is '* * * a definite warning of danger.' The court found that Soriano was negligent in permitting the ISLAND MAIL to penetrate the ten-fathom curve because he failed to make a proper check of the vessel's position and allow for the current.
 
 
 15
 Private Cargo challenges these findings as to proximate cause, and the lack of findings which would have led to the conclusion that negligence on the part of the Government was a proximate cause of the casualty.
 
 
 16
 We discuss first the finding that the CROCKER could not have struck that obstruction because of the depth of the water over the 3.5 rock. Private Cargo contends that finding is based upon the erroneous finding that the 3.5 rock had a height of only eighteen feet at the time of the CROCKER casualty. Private Cargo does not question the report of the Navy divers that the 3.5 rock was only eighteen feet high on July 13, 1961. Private Cargo points out, however, that the Navy divers also reported that this rock was twenty feet wide and twenty-five feet long, as it rested on that date. Private Cargo argues that the court should have found that the 3.5 rock stood twenty-five feet high at the time of both the CROCKER and ISLAND MAIL casualties, but that the rock was pushed over to its present position when it was struck by the ISLAND MAIL.
 
 
 17
 In support of the contention, Private Cargo argues that had the 3.5 rock stood only eighteen feet high at the time of the ISLAND MAIL casualty, it would have been physically impossible for that rock to have come in contact with the actual point of impact on that vessel. The Government tried to explain how that impact could have occurred, by producing evidence showing that a vessel such as the ISLAND MAIL experiences considerable 'sinkage' or 'squat' while in forward motion. But Private Cargo contends that insufficient sinkage was established to close the gap and points to a trial court finding to that effect.[3] Consequently, Private Cargo argues, the rock must have been on end immediately preceding the ISLAND MAIL casualty and, therefore, also on end at the time of the CROCKER casualty.[4]
 
 
 18
 If the trial court had found, on the basis of its own evaluation of the evidence, that the ISLAND MAIL struck the 3.5 rock, then Private Cargo's theory of how this occurred would be most compelling. The court was precluded, however, by the stipulation of the parties from making an independent determination of whether the ISLAND MAIL struck the 3.5 rock; it so found only because of the stipulation and only for the purposes of the cases in which such a stipulation had been entered.
 
 
 19
 There was no such stipulation in the Government-soriano case, to be discussed below. Freed of the stipulation in the Government-Soriano case, the trial court found that the Government had failed to prove the ISLAND MAIL had struck the 3.5 rock. As indicated in our discussion of the Government-Soriano case, the trial court did not err in so finding in that case.
 
 
 20
 We point this out only to demonstrate that the trial court was not required to make a separate finding in the Private Cargo-Government case, independent of the stipulations, that it was physically possible for the ISLAND MAIL to have struck the 3.5 rock. If the parties were unable to establish this fact, the matter would go unexplained. The court found that neither party had proved its theory of how the ISLAND MAIL could have struck the 3.5 rock.
 
 
 21
 Insofar as Private Cargo's theory is concerned, the trial court stated that, if it were deciding the case upon the basis of 'the most probable possibility,' it would find that the ISLAND MAIL struck the 3.5 rock while the rock was in an upright position, and pushed it over from west to east. The court further stated, however, that this would not accord with the evidence and all legitimate inferences therefrom, that such a theory would be premised on speculation and unsupported by the evidence. The court recognized that one diver had conceded the possibility that this had happened, but noted that both divers testified that there was no indication that the rock had been pushed over or a piece sheared off.
 
 
 22
 We have examined the evidence bearing upon the point and we are not convinced that the trial court erred in declining to find that the ISLAND MAIL pushed over the 3.5 rock. The court was therefore warranted in finding that the 3.5 rock was only eighteen feet high at the time of the CROCKER casualty. Hence, the CROCKER did not have enough draft to strike the 3.5 rock at that height, and must have struck some other rock. The conclusion necessarily follows that the failure of the Government to discover and chart the rock which the CROCKER struck, or in erroneously noting the locating of the CROCKER casualty, was not a proximate cause of the ISLAND MAIL's casualty involving the 3.5 rock.
 
 
 23
 In view of our holding on this phase of the proximate cause question, it is unnecessary to enter into an extended discussion of the alternative reasons given by the trial court for finding as it did on the question of proximate cause. It is sufficient to say that our examination of the evidence leads us to believe that the district court did not err in finding that the rock which the CROCKER struck was in a general area .27 miles east of the 3.5 rock;[5] and in finding that, in view of the Stipulated fact that the ISLAND MAIL struck the 3.5 rock, and the fact that this rock is within the ten-fathom curve, the sole proximate cause of the casualty was Pilot Soriano's nigligence in permitting the ISLAND MAIL to penetrate the danger area defined by the ten-fathom curve around Smith Island.[6]
 
 
 24
 Either of those findings is sufficient to sustain the court's ultimate finding and conclusion that the actual or supposed negligence of the Government in failing to discover and chart the 3.5 rock, or in erroneously noting the location of the CROCKER casualty, was not a proximate cause of the ISLAND MAIL accident.
 
 
 25
 In indicating our conclusion with regard to the proximate cause question, we have endeavored to consider all items of evidence introduced and all arguments advanced, although not all of such evidence and arguments have been referred to in the foregoing discussion. Had we been present at the trial, we might not have found as the trial court did on the issue of proximate cause. However, we are not left with a definite and firm conviction that the trial court erred in finding as it did on that issue. See Guzman v. Pichirilo, 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205.
 
 
 26
 In view of the trial court's finding and conclusion on the issue of proximate cause, which we uphold, it is unnecessary to consider either Private Cargo's challenge to the findings on the issue of the Government's negligence, or the Government's argument that the United States had no legal duty in connection with the ISLAND MAIL casualty.
 
 
 27
 The trial court did not err in dismissing, with prejudice, Private Cargo's libel against the Government.
 
 Private Cargo-Mail Line Case
 
 28
 In its claim and answer filed in this limitation proceeding, Private Cargo alleged, as a basis for asserting liability against Mail Line, '* * * general unseaworthiness, the particulars of which will be determined on discovery.' Extensive pre-trial discovery proceedings led to the entry of a comprehensive pre-trial order which superseded the pleadings. On the basis of information developed during pre-trial discovery, certain 'admitted facts' were stated in the pretrial order. It was admitted by both parties that prior to and during the voyage in question, the managing officials of Mail Line knew the ISLAND MAIL's fathometer was not functioning and was disconnected.[7]
 
 
 29
 In its contentions of fact set out in the pre-trial order, Mail Line asserted:
 
 
 30
 '4. The ISLAND MAIL was not unseaworthy because of the condition of the fathometer. In any event, the said condition had nothing to do with the striking of the unknown and unchartered rock. * * *'
 
 
 31
 Eight reasons were then stated why the condition of the fathometer had nothing to do with the striking of the rock.
 
 
 32
 In its statement of facts not to be contested, Private Cargo stated the following with regard to the above-quoted statement of fact by Mail Line concerning the fathometer:
 
 
 33
 'United Pacific (Private Cargo), does not intend to contest such facts at trial by evidence to the contrary, but are unable to concede the same; and if it be proven by evidence introduced by any other party that the vessel was unseaworthy and that the use of the fathometer may have avoided the casualty, United Pacific intends to rely on same.'
 
 
 34
 In this pre-trial order, Private Cargo also asserted that the ISLAND MAIL casualty occurred while that vessel was 'navigating properly.'
 
 
 35
 During the trial Private Cargo did not offer any evidence of, or assert, any unseaworthiness concerning ISLAND MAIL, nor did it contend that the non-operating fathometer was a proximate cause of the collision with the 3.5 rock. Private Cargo, waived argument on its claim against Mail Line. Immediately after argument, but before decision on the other cases, the trial judge dismissed Private Cargo's particular average claims against Mail Line, stating that the inoperability of the fathometer did not render the vessel unseaworthy.
 
 
 36
 Private Cargo and Mail Line had stipulated that the ISLAND MAIL struck the 3.5 rock, which was concededly within the ten-fathom curve. One way of avoiding penetration of that curve would have been to use a fathometer. But the district court specifically found that in view of the conditions of the sea and weather, there were other devices aboard the ISLAND MAIL adequate for determining the depth of the water.[8]
 
 
 37
 Accordingly, the court found that the ISLAND MAIL was not rendered unseaworthy because of the condition of the fathometer. It further found that the condition of the fathometer had nothing to do with the ISLAND MAIL casualty. The court concluded that the penetration of the ten-fathom curve, and consequently the striking of the 3.5 rock, was occasioned by the pilot's failure to fix the ISLAND MAIL's position accurately with the means at hand, and his failure to take account of the easterly set of the current.
 
 
 38
 Private Cargo did not take a firm position on the fathometer issue until this appeal, when it challenged the district court's findings of fact with regard to the fathometer. Emphasizing the fact that the trial court had found that the ten-fathom curve defines a danger area, Private Cargo argues here that an operating fathometer would have enabled the ISLAND MAIL to stay clear of that area. It points out that at the time of the casualty, the only means on board the ISLAND MAIL for determining the actual depth of water beneath the vessel's keel was by hand sounding with a lead line or by using her so-called mechanical sounding machine.
 
 
 39
 Private Cargo also contends that a fathometer is usual and customary equipment aboard ocean-going vessels; that most soundings are now made by means of fathometers; and that the vessel's navigator had requested that the fathometer be repaired. Private Cargo argues that while a fathometer would not detect an isolated rock in time to avoid it, it would quickly detect penetration of the ten-fathom curve.
 
 
 40
 Mail Line, on the other hand, calls attention to other items of evidence, and makes counter arguments, tending to support the district court's findings of fact. We list the principal items of this kind, relied upon by Mail Line:
 
 
 41
 1. Although officials of the U.S. Coast Guard and the Maritime Administration knew the fathometer was inoperable, an unrestricted certificate of inspection of the ISLAND MAIL was nevertheless issued.
 
 
 42
 2. The official requirement for a sounding apparatus, found in the provisions of 46 C.F.R. 96.27-1, is expressed in the alternative of either a mechanical or electronic machine.
 
 
 43
 3. The parties stipulated that on May 29, 1961, the ISLAND MAIL was equipped with an adequate mechanical sounding machine in good working order.
 
 
 44
 4. It was possible to determine the vessel's position with respect to Smith Island Lighthouse by means of cross-bearings obtained by use of the vessel's azimuth circle and gyro compass repeater, and by laying down that position on a chart to determine whether the vessel was within or without the ten-fathom curve.
 
 
 45
 5. Chief Mate White testified that ISLAND MAIL's sounding machine which could be used at fifteen knots was 'an adequate substitute a fathometer.'
 
 
 46
 6. Third Mate Gunderson testified: 'If the fathometer had've been working, I doubt very much if it would have been running.'
 
 
 47
 7. ISLAND MAIL's grounding occurred under ideal sea and weather conditions with exceptionally good visibility.
 
 
 48
 8. Captain Floyd E. Smith testified that there was no reason for a prudent pilot to use a fathometer on a clear day.
 
 
 49
 9. Captain Robert H. Curry testified that a fathometer is 'not necessary' around the west side of Smith Island.
 
 
 50
 Although the Supreme Court has recently held that a shipowner has an absolute duty to provide a seaworthy vessel, the same Court stated the following:
 
 
 51
 'The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.' Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).
 
 
 52
 Applying this standard to the items of evidence relied upon by the parties, not all of which are set out above, we conclude that the trial court's finding of fact, that the ISLAND MAIL was not rendered unseaworthy because the fathometer was inoperative, is not clearly erroneous.[9]
 
 
 53
 We reach the same conclusion concerning the finding of fact that the condition of the fathometer was not a proximate cause of ISLAND MAIL's casualty. The conclusion that the finding as to proximate cause is not clearly erroneous is enough to sustain the dismissal of Private Cargo's libel against ISLAND MAIL, even if the trial court erred in finding that the condition of the fathometer did not render the ISLAND MAIL unseaworthy. In order to prevail, Private Cargo had to establish both unseaworthiness and proximate cause.[10]
 
 
 54
 The trial court therefore correctly dismissed, with prejudice, Private Cargo's libel against Mail Line.
 
 Government-Soriano Case
 
 55
 The Government's case against Dewey Soriano, pilot of the ISLAND MAIL at the time of the casualty, was premised on the theory that the ISLAND MAIL struck a rock within the ten-fathom curve, which defined a known danger area. Specifically, the Government contended that Soriano was negligent in failing to take proper bearings, failing to allow for the easterly set of the current, failing to make an accurate fix of the vessel's position, failing to consult charts, and failing to give the area west of Smith Island a sufficiently wide berth while making a passage around the island in proceeding north toward Bellingham; and that such negligence was the proximate cause of the casualty.
 
 
 56
 Soriano denied that the ISLAND MAIL struck the 3.5 rock and contended that it struck an uncharted object just outside (westerly) of the boundary of the ten-fathom curve around Smith Island. He also asserted that Government charts and other navigational publications showed safe depths of water and no underwater objects which would be dangerous to safe passage of vessels the size and draft of the ISLAND MAIL. Soriano took the position that if the government had properly performed its duties after the 1952 CROCKER incident, by investigating reported casualties, marking underwater dangers in the prescribed manner, and publishing accurate charts and other notices to mariners, he would have given the west side of Smith Island a wider berth and the accident would not have happened.
 
 
 57
 The critical issue was therefore whether the ISLAND MAIL was within the ten-fathom curve when the casualty occurred. This issue was not present in the other two cases, in which Soriano was not a party, since in those cases all parties stipulated that the ISLAND MAIL struck the 3.5 rock, which was about one ship length inside the tenfathom curve.[11] In those cases the trial court was required to assume that Soriano had permitted the ISLAND MAIL to penetrate the ten-fathom curve. As indicated in the above discussion of those cases, the court found that since the water within the ten-fathom curve was a danger area, the proximate cause of the casualty was Soriano's negligence. In the Government-Soriano case, however, there is no such stipulation and the trial court was not required to assume that the ISLAND MAIL penetrated the ten-fathom curve.
 
 
 58
 In considering the question of whether the ISLAND MAIL casualty occurred within the ten-fathom curve, the trial court found that Soriano had been negligent in several particulars. The court found he had made no allowance for an easterly set of the current beyond Point Wilson. Moreover, Soriano had used a device known as a kenyon calculator for the purpose of taking a bearing. This device is not designed as a bearing instrument, and in any event, was used inaccurately by Soriano. In addition, the court found that none of the ISLAND MAIL's positions were plotted on any of the vessel's charts.
 
 
 59
 The court also found unreliable the statements of three of the ship's officers who testified that at the point of impact their navigational data established that the ISLAND MAIL was at a specific location outside the ten-fathom curve. There was no other testimony, based on such data, as to the point of impact. On the other hand, the court found that the evidence tending to show that the ISLAND MAIL casualty occurred within the ten-fathom curve, including the physical evidence tending to show that the ISLAND MAIL struck the 3.5 rock, was insufficient to support a finding of fact to that effect.
 
 
 60
 The court, therefore, made no finding in the Government-Soriano case that the ISLAND MAIL was within or without the ten-fathom curve at the time of the casualty. Instead, it found:
 
 
 61
 '24. The evidence and all permissible inferences that can be drawn therefrom fail to establish by a fair preponderance that the M/V ISLAND MAIL was actually inside the 10-fathom curve at the time it struck an uncharted and submerged rock on May 29, 1961.
 
 
 62
 '25. The evidence and all permissible inferences that can be drawn therefrom fail to establish by a fair preponderance that the M/V ISLAND MAIL could have or did actually strike the 3.5 fathom rock.'
 
 
 63
 The trial court concluded that the Government had failed to sustain its burden of proving that Soriano was negligent with respect to the ISLAND MAIL casualty. On this ground the libel was dismissed with prejudice.
 
 
 64
 On this appeal the Government contends that the trial court erred in failing to hold that there eas a presumption of fault against Pilot Soriano for grounding the ISLAND MAIL. The Government concedes that the burden of proving negligence in an admiralty case is on the libellant. It argues, however, that under the circumstances of this case, the Government had to prove only that a 'certain set of facts' exist, and Pilot Soriano was then put to proof of his due care, caution and skill. The Government states that under established principles of admiralty law, a pilot is under a 'presumption' of fault in such circumstances.
 
 
 65
 The 'certain set of facts' to which the Government refers is apparently the facts establishing that the ISLAND MAIL went aground while proceeding in clear weather, through the eastern portion of the Straits of Juan de Fuca. The Government argues that the presumption of fault on the part of the pilot arising from these facts required Soriano to establish his position at the time of the grounding '* * * so that it can be determined if he was even in the customary track followed by deep draft vessels.'
 
 
 66
 In support of its legal contention as to the applicable presumption of fault, the Government cites a number of cases in which a presumption of fault was applied against the pilot where it was established that the piloted vessel had struck an anchored vessel, shore structure or breakwater which was either visible or the location of which the pilot was charged with knowing.[12] The Government also cites two cases in which a presumption of fault was applied against the pilot where the piloted vessel had grounded in a river with a well-known navigable channel.
 
 
 67
 It is questionable whether a presumption of fault on the part of a pilot, applicable under the circumstances of those cases, is also applicable when a ship strikes a submerged and uncharted rock in a body of water the size of the eastern portion of the Straits of Juan de Fuca. But, assuming the presumption is applicable, the cited cases do not establish that such a presumption requires a pilot to establish his position at the time of the grounding. None of the cited cases held that the pilot had the burden of proving, or the burden of going forward with the evidence to establish, the place where the grounding occurred. In each case, the place of grounding was apparently established on the basis of undisputed evidence, the presumption of fault on the part of the pilot then being applied.[14]
 
 
 68
 In this case, however, the location of the casualty is disputed, and the trial court declined to make a finding as to location because of insufficient evidence. in our opinion, the presumption referred to above does not arise until the libellant, who has the ultimate burden of proof, produces evidence which should lead the court to find that the casualty occurred at a place which should give rise to the presumption. If the trial court findings on this point are not clearly erroneous, the Government failed to produce sufficient evidence of the casualty location to raise the presumption.
 
 
 69
 The Government further argues, however, that the findings of fact on this point are clearly erroneous, and that the trial court erred in failing to find that the ISLAND MAIL struck the 3.5 rock or that, in any event, the casualty occurred within the ten-fathom curve. In support of this argument the Government calls attention to the following items of evidence: (1) the position of grounding claimed by Soriano was less than .05 miles outside the ten-fathom curve, and even that position was questioned by the trial court; (2) the trial court found that Soriano was negligent in several respects in navigating the ISLAND MAIL; (3) Soriano made no allowance for an easterly set of the current which tended to set the ISLAND MAIL into the ten-fathom curve; (4) detailed hydrographic and wire drag surveys failed to reveal any obstruction outside the ten-fathom curve with which the ISLAND MAIL could have made contact; (5) there are numerous charted and uncharted rocks within the ten-fathom curve; (6) at the 3.5 rock, within the ten-fathom curve, Navy divers recovered steel plates from a ship casualty, some of which had been in the water from a time coincident with the ISLAND MAIL casualty, and some of which could be metallurgically matched up with plates from the ISLAND MAIL; and (7) there was no evidence that any other vessel had grounded in the vicinity of the 3.5 rock which could account for the physical evidence recovered by the Navy divers.
 
 
 70
 As noted above, in the other cases the Government stipulated with Mail Line and Private Cargo that the vessel struck the 3.5 rock. In the Government-Soriano case, now under discussion, the Government likewise contended in the pre-trial order that the ISLAND MAIL struck the 3.5 rock. Prior to this appeal the Government did not contend that the ISLAND MAIL may have struck some other obstruction within the ten-fathom curve.
 
 
 71
 The trial court found that in view of the depth of the water over the 3.5 rock as it was found after the casualty, the ISLAND MAIL could not have struck it as the rock was then positioned, even allowing for sinkage or squat due to the forward motion of the vessel. While there was evidence that the 3.5 rock had recently been struck, the court found that the physical objects found close to the rock were not sufficiently linked to the ISLAND MAIL to establish that it was the colliding vessel. The trial court also found insufficient evidence to establish that the 3.5 rock was in a different position previous to the ISLAND MAIL casualty, which would have made it possible for the ISLAND MAIL to strike it.
 
 
 72
 We have examined the evidence bearing upon these findings. Although we might not have made the same findings as the trial court, we are not left with a definite and firm conviction that a mistake has been committed. Accordingly, the findings of fact in question are not clearly erroneous. It follows that the district court did not err in failing to make findings of fact to the contrary.
 
 
 73
 The findings of fact support the trial court's conclusion of law that the Government failed to sustain its burden of proof that Soriano was negligent with respect to the ISLAND MAIL casualty. The Government's libel against him was therefore properly dismissed with prejudice.
 
 
 74
 The final decrees in all three cases are affirmed.
 
 
 
 [1]
 This rock was determined by Navy divers to have a least depth of twenty-two feet below the surface of the water at mean lower low water, in the position in which it was found on July 13, 1961. The depth was therefore approximately 3.5 fathoms-- twenty-one feet
 
 
 [2]
 In its opening brief on appeal, Private Cargo states (page 68):
 'The rock (3.5 rock) was 1.87 miles westerly of Smith Island Light * * * and 486.4 feet-- about one ship length, inside the 10-fathom curve.'
 
 
 [3]
 In its oral decision, which was incorporated by reference into the formal findings of fact, the district court stated:
 'Even if we add the maximum amount of sinkage testified to by Mr. Beal, which testimony the Court struck, the point of indentation is 2 feet 10 1/2 inches above the top of the rock and there is nothing in the evidence to account for this difference.'
 
 
 [4]
 In further support of this view, Private Cargo: (1) calls attention to markings on the 3.5 rock which tend to show that it must have been in an upright position when struck by the ISLAND MAIL; (2) refers to the testimony of Third Mate Gunderson, who described the action of the ISLAND MAIL at the time of the casualty as being 'like we rolled something over'; (3) notes that one Navy diver conceded that the rock could have been rolled over; and (4) refers to evidence tending to show that a ship the size and weight of the ISLAND MAIL was capable of pushing over a rock of that size
 
 
 [5]
 The court found, on the basis of the testimony of H. R. Edmonston, that the CROCKER did not strike the rock struck by the ISLAND MAIL '* * * even if that rock were sufficiently close to the surface so that it would have been physically possible for the CROCKER to have come in contact with the rock.'
 
 
 [6]
 In the Government-Soriano case the trial court found that while Soriano had been negligent in several particulars concerning his methods of navigation, such negligence was not shown to be a proximate cause of the ISLAND MAIL casualty because it had not been established that the vessel had penetrated the ten-fathom finding and the finding in the Private Cargo-Government case, that Soriano's negligence was the sole proximate cause of the casualty, is due to the fact that the trial court was bound by a stipulation in the Private Cargo-Government case concerning the striking of the 3.5 rock which necessarily placed the ISLAND MAIL within the ten-fathom curve
 
 
 [7]
 A fathometer is an echo sounding device for determining the depth of water beneath a vessel's keel. It gives continuous readings of the depth of the water under the keel while the vessel is at full speed and these readings are presented both on a dial and on a graph on the ship's bridge
 
 
 [8]
 The district court found that the Following devices were aboard the ISLAND MAIL at the time of the casualty: Copies of the U.S. Coast and Geodetic Survey Charts which contained the latest material corrections for the eastern portion of the Straits of Juan de Fuca and the area west of Smith Island, an adequate mechanical sounding machine in goos working condition, and adequate azimuth circles, peloruses, radar, gyro compass repeaters and sextants to locate the vessel's position
 
 
 [9]
 Within the past year, this court reaffirmed its long established rule that findings of a trial court as to seaworthiness are not to be upset unless 'clearly erroneous.' Walston v. Lambertsen, 9 Cir., 349 F.2d 660, 663 (1965)
 
 
 [10]
 See THE MALCOLM BAXTER, JR., 277 U.S. 323, 331, 48 S.Ct. 516, 72 L.Ed. 901; THE TEMPLE BAR, D.C.Md., 45 F.Supp. 608, aff'd, 4 Cir., 137 F.2d 293; THE SAN GUISEPPE, E.D.Va., 1941 A.M.C. 315, aff'd, 4 Cir., 122 F.2d 579
 
 
 [11]
 See note 2, supra
 
 
 [12]
 See THE OREGON, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; THE VIRGINIA EHRMAN and THE AGNESE, 97 U.S. 309, 24 L.Ed. 890; THE LOUISIANA, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; National Development Company v. City of Long Beach, S.D.Cal., 187 F.Supp. 109, aff'd, 9 Cir., 289 F.2d 586; Carr v. Hermosa Amusement Corp., Ltd., 9 Cir., 137 F.2d 983; Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co., 5 Cir., 199 F.2d 761; Ford Motor Co. v. Bradley Transp. Co., 6 Cir., 174 F.2d 192; THE VICTOR, 5 Cir., 153 F.2d 200
 
 
 [13]
 Matheson v. Norfolk & North American Steam Shipping Co., 9 Cir., 73 F.2d 177; Louis-Dreyfus v. Paterson Steamships, Ltd., 2 Cir., 43 F.2d 824, 72 A.L.R. 242
 
 
 [14]
 The Government relies primarily upon THE ARLINGTON, 2d Cir., 19 F.2d 285, 286, 54 A.L.R. 101 (1927), to support its contention that the burden of proof should be placed upon Soriano. We think the Government misconstrues the holding in THE ARLINGTON. This is demonstrated by consideration of the authority cited in that decision. The case cited by the Second Circuit in THE ARLINGTON to support its conclusion is THE WYOMISSING, 2 Cir., 228 F. 186. In THE WYOMISSING, the ship involved had a leak which could have accounted for her increased draft and the resulting casualty. There being no other reasonable explanation for the accident, the court stated: 'If the tow strikes a rock in the channel, as the District Judge found in this case, the claimant is bound to show that the rock was an unknown obstruction.' Id. at 187. It is significant that the court did not require the pilot to establish the point of impact-- this was already done by the district judge. Rather, he was only required to show that the rock was an unknown obstruction, in which case he would be relieved of liability
 THE WYOMISSING court cites two cases to support the quote above. THE MARY N. HOGAN, D.C.Cir., 30 F. 927; THE PIERREPONT, D.C.Cir., 42 F. 687. In both cases libels against the defendants were dismissed, the courts holding that since, as the courts found, the accidents had occurred in the regular channel where no obstruction was known to exist by those engaged in the navigation of the river, the libellants could not recover.