**DEUTSCHE SHELL TANKER–GESELLSCHAFT mbH**

v.

**PLACID REFINING COMPANY.**

Civ. A. No. 86–5683.

United States District Court, E.D. Louisiana.

July 8, 1991.

Richard Ashworth, Michael Sommer, Haight, Gardner, Poor & Havens, New York City, Francis Barry, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

James G. Burke, Jr., Andrew C. Wilson, Burke & Mayer, New Orleans, La., for defendant.

## OPINION

PATRICK E. CARR, District Judge.

This matter came before the Court for trial without a jury on the issue of liability

only. The Court now rules as follows. To the extent the following findings of fact constitute conclusions of law, the Court adopts them as such; to the extent the following conclusions of law constitute findings as fact, the Court adopts them as such.

This is a general average case under maritime law. Shell seeks a general average contribution from Placid for expenses in degrounding Shell's tanker DIALA during a voyage in June 1983 when the DIALA grounded while carrying crude oil from Sullom Voe, United Kingdom to Placid's facilities in Port Allen, Louisiana. Placid defends on three general grounds: first, Shell's claim is barred by the admiralty doctrine of laches; second, Placid did not own any cargo on the DIALA at the time of the voyage when the DIALA encountered its difficulties; and third, the DIALA was unseaworthy when it began its voyage by being overloaded for travel on the Mississippi River and by having defective radar equipment.

The Court rejects Placid's first and second defenses and finds that the DIALA was not overloaded on this voyage. Concluding, however, that there was no general average act and alternatively that defective radar equipment from Shell's poor maintenance had made the DIALA unseaworthy before its voyage and was a proximate cause of the grounding, the Court holds that Placid is not responsible for a general average contribution here.

## I.

The plaintiff in this action is Deutsche Shell Tanker–Gesellschaft mbH (Deutsche Shell),[1] a German corporation with its principal place of business in Germany. Shell International Marine Limited (Shellimar) and Shell International Trading Company (Shell Trading) are separate divisions of Shell International Petroleum Company Limited, which is a corporate affiliate of Deutsche Shell (collectively, Shell).

At all material times, Deutsche Shell owned and operated the DIALA, an 800–foot long steam tanker built in 1966 and capable of carrying up to 70,000 tons of crude oil, and had the DIALA under a long-term time charter to Shellimar.

The defendant in this action is Placid Refining Company (Placid), a Delaware corporation with its principal place of business in Texas. Placid owns a crude oil refinery on the Mississippi River at Port Allen, Louisiana.

### A. The CFSA contract

By the late 1970s, Shell had amassed one of the world's largest fleets of oil tankers. Shell Trading was formed, among other reasons, to offer crude-oil transportation and trading services to non-Shell entities. Among the services Shell Trading developed were "Crude Freight Service Arrangements" (CFSAs). Under a CFSA, Shell would buy oil in one location from a party at some established price and then later, when the party was ready for delivery of the oil at a different location, would sell and deliver at the different location an equivalent quantity of oil to the party under the same established pricing system, with an additional agreed-upon rate for freight, with or without insurance at the party's option. The oil that Shell would sell to complete a single CFSA transaction might or might not be the same oil that Shell had bought; generally, the oil Shell would buy passed into "the Shell system" for use by Shell or some third-party, and Shell would obtain another load of oil for delivery to the contracting party when the contracting party was ready for delivery. These contracts, which would generally apply over a six-month or one-year period, gave the contracting party a degree of flexibility in the timing between the production and delivery-for-refining of quantities of oil.

Sometime in late 1979, David J. Fruin of Shell Trading telephoned Paul B. Wehner, Placid's crude oil manager, to offer Shell's

---

**1.** The complaint erroneously lists the plaintiff's name as "Deutsche Shell Tankers A.G." In the pretrial order, the parties noted the correction. *See* Record Document No. (R.Doc.) 35, ¶ 3, at 1.

Various documents admitted at trial confirm the correct name. *See, e.g.,* Exh. P11 (caption and stamp); P12, box 18; P25 (caption); D3(3).

CFSA services to carry oil cargo for Placid. The call was successful. Shell Trading and Placid entered into a series of six-month or one-year term CFSAs, all of which Shell drafted. For the portion of the CFSAs whereby Placid would buy back the oil from Shell, Placid always agreed that it, and not Shell, would obtain insurance for Shell's carriage of such cargo. That is, Placid chose to buy the oil back on C & F terms, and not on CIF terms.

Over time, market conditions changed in the oil industry, and Placid and/or Shell no longer wanted to continue the CFSAs on an extended basis. Thus, by at least the beginning of 1983, the parties did not renew in effect any CFSA. The parties did not, however, intend to cease doing business. In January 1983, they agreed to a proposed "blanket" CFSA (to be completed with details on price, quantity, and time) for possible later use.

Around May 9, 1983, Wehner of Placid telephoned Fruin of Shell Trading to hire Shell's services for the transportation of a single load of crude oil from Sullom Voe, Shetland Islands, United Kingdom to Placid's refinery at Port Allen, Louisiana. Rather than use a voyage charterparty more typical for a spot contract for the carriage of a single shipment of cargo,[2] Fruin suggested to use the proposed CFSA from January as the basis for the governing terms, notwithstanding that the CFSAs were designed for term, and not spot, contracts; Fruin agreed.

The parties reached an agreement by telephone on May 10, 1990. The following day, Fruin sent a telex, which reads in whole:

We confirm telecon Wehner/Fruin on May 10th in which we agreed a spot fixture under the C.F.S.A. arrangements between us whereby we shall purchase from you F.O.B. Sullom Voe 60000 tonnes plus/minus 5 percent Brent Blend and sell to you C and F Port Allen 60000 tonnes plus/minus 5 percent. The C and F price will include a freight component

equivalent to 47 points of the worldscale basic rate from Sullom Voe to Port Allen. The parcel of crude is available for loading ex Sullom Voe May 21–23 and we intend to load this parcel on the DIALA due Sullom Voe May 21 and due Port Allen June 7th. Owing to the 40 foot fresh water draught in the Mississippi, the DIALA will not be able to load anything much in excess of 60000 tonnes. Secundo. We have amended the C.F.S.A. terms handed to you on 14th January 1983 as follows, in order to reflect the agreed conditions for this particular spot purchase and sale:

[Sets forth enumerated changes to five clauses]. All other clauses and subclauses remain unchanged.

Tertio. We are very pleased to have arranged this business with you and look forward to when we may resume our cooperation on a term basis. We request your telexed advice that you agree to all the above.

See Exh. P1, at 2–3. Concurring in the confirmation, Wehner sent a reply telex, which reads in whole:

We hereby agree to the C.F.S.A. terms as stated in your telex of 11 May 1983, whereby Shell International Trading Company lifts 60,000 tonnes of Brent crude oil from Sullom Voe terminal 21–23 May on vessel DIALA for delivery to Placid Refining Company at Port Allen, Louisiana.

See Exh. P1(1). Soon thereafter, Fruin mailed Placid a written CFSA, effective May 10, 1983, to reflect fully the terms of the parties' contract; both Shell Trading and Placid signed this CFSA, which, like all the earlier CFSAs, Shell Trading had drafted. This CFSA contains the following pertinent terms:

WHEREAS it is agreed as follows that in order that Shell [Trading] may effect a complete freighting service on behalf of Placid for the shipment of the latter's Brent blend crudeoil from Sullom Voe, U.K. to Port Allen, Louisiana, USA, Shell

---

2. The variety of charterparties specifically designed for carriage of crude oil on a tanker are legion. *See, e.g.,* 2C BENEDICT ON ADMIRALTY ch. 17

(6th ed. 1991) (reproducing 27 tanker charterparties for carriage of petroleum).

will purchase Placid's availability of Brent blend crudeoil FOB Sullom Voe and will sell to Placid an equal quantity of the same grade of crudeoil C & F Port Allen.

## DEFINITIONS

For the purposes of this Agreement the terms "Buyers" and "Sellers" and "Oil" shall be defined as follows

Sellers: —The selling party, either Shell or Placid as the case may be.

Buyers: —The buying party, either Shell or Placid as the case may be.

The Oil: —Brent blend crude oil

## TYPE, QUANTITY AND PERIOD OF DELIVERY

1.(1) Placid shall sell and Shell shall purchase 60,000 tonnes of the oil plus or minus 5 per cent for shipping operational purposes FOB (free on board) Sullom Voe in one parcel.

(2) Shell shall sell and Placid shall purchase 60,000 tonnes of the oil plus or minus 5 per cent for shipping operational purposes C & F Port Allen in one parcel.

. . . .
## PRICE

4.(1) Subject as hereinafter provided Shell will pay to Placid for each barrel (of 42 U.S. Gallons) of clean oil ... purchased by Shell under this Agreement, a price equivalent to the British National Oil Company's official Selling Price ruling on the day on which loading of the parcel was completed FOB Sullom Voe....

(2) Subject as hereinafter provided Placid will pay to Shell for each barrel (of 42 U.S. Gallons) of clean oil ... purchased by Placid under this Agreement, a price equivalent to the British National Oil Company's official Selling Price for the Oil ruling on the day on which loading of the parcel was completed FOB Sullom Voe ..., plus a freight component equivalent to 47 points of Worldscale applicable as at

1st January, 1983 for the voyage Sullom Voe to Port Allen.

. . . .
## PAYMENT

. . . .

6.(4) Depending on the circumstances prevailing for each individual shipment, payment will be required by either of the two following methods:

. . . .

(ii) In instances where Shell loads Placid's oil and takes the aforesaid oil direct to Placid's requested post of discharge the FOB invoice issued by Placid can be "offset" against the C & F invoice issued by Shell thereby resulting in a "net-out" payment of freight only, being payable by Placid on the due date according to conditions in Clauses 4(2) and 6(1) [on place of payment by Placid to Shell].

. . . .

## PASSING OF PROPERTY & RISK

7.(1) The oil loaded under this Agreement shall be at the risk of the Buyers as soon as it passes the vessel's permanent hose connection at the port of loading.

(2) For the oil sold C & F by Shell to Placid the oil shall be insured by Placid at Placid's expense and such expense and such insurance shall cover the period from the time when the risk passes until arrival of the oil at destination and shall be covered by a standard Lloyd's Marine Insurance Policy with Bulk Oil Clauses and Institute War, Strikes, Riots and Civil Commotion Clauses attached.

(3) For the oil sold FOB by Placid to Shell the oil shall be insured by Shell at Shell's expense and such expense and such insurance shall cover the period from the time when the risk passes until arrival of the oil at destination and shall be covered by a standard Lloyd's Marine Insurance Policy with Bulk Oil Clauses and Institute War,

Strikes, Riots and Civil Commotion Clauses attached.

(4) Property in the oil loaded under this Agreement shall pass to buyer when loaded vessel reaches 400 miles outside of UK territorial waters or immediately prior to the entry of the vessel into the territorial waters of the country where the discharge port is located; whichever is the sooner.

## NOMINATION PROCEDURE

8.(1) On or before the 1st day of each month Placid shall advise Shell of their loading requirements for the following month and their arrival requirements in the form of:—

. . . .

v) Instructions regarding the make-up and disposition of Bills of Lading and other documentation required for the port of discharge. . . . Documentation procedures are detailed in Appendix 'B' attached hereto.

. . . .

## ACCEPTANCE/SUBSTITUTION

9.(1) The acceptance by Placid of a nomination [of a vessel] made by Shell under Clause 8 hereof shall operate to effect between Shell as Owners and Placid as charterers a chartering of the nominated vessel on the terms and conditions of the "Shellvoy 4" Charter Party. See "Appendix C". In the event of any conflict between "Shellvoy 4" and this Agreement, then the provisions of this Agreement shall prevail.

. . . .

## DISPUTES AND JURISDICTION

. . . .

26.(3) This Agreement shall be construed and take effect in accordance with English Law.

. . . .

(5) An obligation under this contract shall not apply if and to the extent that it is incompatible with mandatory pro-

visions of law applicable to the party in question.

## ASSIGNMENT

27.(1) Shell shall have the right at any time to assign to any Affiliate all or part of the rights and obligations to sell and deliver the oil in accordance with the terms of this Agreement, Shell remaining responsible for the fulfilment of the terms and conditions of the Agreement in accordance with paragraph (2) of this Clause.

(2) Any such assignment shall be effected by notice in writing from Shell countersigned by the Assignee to signify its acceptance of the obligations under this Agreement. Upon the making of any such assignment, Shell shall remain bound as guarantors for due performance of the said obligations (as so accepted) by the Assignee.

. . . .

*See* Exh. P1, at 4–9, 17–18. Attached as Appendix B to the CFSA is an uncompleted typewritten form, which reads as follows:

## CARGO DOCUMENTATION

(1) In instances where Shell loads oil and takes the aforesaid oil into the Shell 'System', Shell shall advise of the full cargo documentation required for the port of discharge, to enable to pass such documentation to supplier. For discharge ports in N.W. Europe, unless otherwise advised, Shell shall require to provide the following standard documentation:—

CONSIGNEES: Shell International Trading Company
DESTINATION:
SPECIAL REQUIREMENTS: Certificate of Origin—To be endorsed by Local Chamber of Commerce.

. . . .

(2) In instances where Shell payback against (1) above an equivalent quantity and quality of oil at a different date, shall advise Shell of the full cargo documentation required for the port of dis-

charge. For discharge ports, unless otherwise advised, shall require Shell, to provide the following standard documentation:—

[none listed on form]

(3) In instances, where Shell loads oil and takes the aforesaid oil direct to requested port of discharge, will advise their supplier direct of the necessary cargo documentation.

. . . .

*See* Exh. P1, at 21–22. Attached as Appendix C to the CFSA is an edited version of a standard "Shellvoy 4" voyage charterparty (May 1980 ed.), which in clause 32 contains the standard New Jason Clause and other standard provisions on general average:

General Average shall be payable according to the York/Antwerp Rules, 1974, and shall be adjusted in London, but should the adjustment be made in accordance with the law and practice of the United States of America, the following clause, which shall be included or deemed to be included in all bills of lading issued pursuant to this charter, shall apply:

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier or its agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Carrier before delivery.

*See* Exh. P1, at 30, lines 385–398. According to Fruin, this CFSA was the sole contract between Placid and Shell during 1983.

Pursuant to the parties' agreement, Shell Trading nominated the DIALA to carry the cargo and made arrangements for the loading of the DIALA at the Sullom Voe terminal. On May 21, 1983, the DIALA completed loading 58,548 metric tons of Brent blend crude oil ready for carriage to Port Allen.

On that same day, the DIALA's master at the time, Rüdiger Schätzel, issued a bill of lading for the cargo at Sullom Voe. The bill bears the preprinted title "SHELL BILL OF LADING/*Printed October 1979."* The bill's first line contains the preprinted entry "SHIPPED in apparent good order and condition by" and is followed by the typed-in entry "SHELL UK LTD FOR ACCOUNT SHELL INTERNATIONAL TRADING CO." The bill then provides for the cargo "to be delivered ... unto TO ORDER PLACID REFINING CO or order." The reverse side of the bill contains the same preprinted general average provisions as are quoted above from clause 32 of the Shellvoy 4 charterparty. *See* Exh. P2.

Neither Shell nor Placid ever obtained insurance for this load of oil.

### B. *The radar*

Because the DIALA is a self-propelled "vessel of 10,000 gross tons or more," it is required by Coast Guard regulations to have two "marine radar system[s] that operat[e] independently of" each other (that is, "two completely separate systems"), at least while it is operating on the Mississippi River. *Compare* 33 CFR § 164.35(a) *and id.* § 164.37(a) *with* 33 U.S.C. § 1223(a)(3) *and* 33 CFR § 164.01(a). *See also* International Convention for the Safety of Life at Sea, 1974 (SOLAS 1974), ch. V, reg. 12(h) (same), *reprinted in* 6B BENEDICT ON ADMIRALTY Doc. 14–8, at 14–392 (6th ed. 1991).

### 1. The equipment

In 1973, Shell had two such independent radar units installed on the DIALA: a Raytheon/Selenia RM 10–centimeter S-band model (10–cm unit) and a Raytheon/Selenia TM 3–centimeter X-band model (3–cm unit). In June 1982, Shell had the 10–cm unit's display screen equipped with a Prora ARPA (automatic radar plotting aid).[3] At least when functioning properly, these two units satisfied these Coast Guard regulations.

The DIALA's two radar units are similar in design. Each has a 16–inch display screen on the bridge: the 10–cm's display is located up front just behind the windows facing the bow, while the 3–cm's display is located further aft. *See generally* Exh. P7 (sketch of bridge layout). Each display leads to an MTR (modulator/transmitter/receiver) unit in an adjoining room; in this room as well is a generator for each unit. Connecting to the 10–cm MTR unit is a coaxial cable that leads up to a 12–foot long antenna array unit on the mast atop the bridge. Connecting to the 3–cm MTR unit is a hollow metal "waveguide" that leads up to another, shorter-in-height 12–foot long antenna array unit on the same mast. The antenna array covers are made of fiberglass. Because the antenna unit must make 360° sweeps, the antenna base contains rotary ball bearings above and below the actual array unit. *See generally* Exh. P27, figure 6 (schematic of 3–cm antenna unit).

Service repair reports for 1980–1981 show that, at least at that time, the 10–cm unit had a time meter that measured the number of hours the unit was turned on. *See* Exh. D3(2), (16), (19), (21), (25), (26), (29). Based solely on his inspections of other tankers and other classes of ships in general (and apparently not on any time meter readings on or records from the DIALA), Shell's radar expert, Tom Stakelum, estimated that the DIALA's use of the 3–cm radar unit averaged between 1500 and 2500 hours per year.[4] *See* Tr. III:79–80.

A simple, layman's explanation of certain of the radar units' components is helpful.[5] A modulator sends power to a magnetron, which converts the power to dense RF (radio frequency) energy for transmitting out the radar unit. This RF energy passes through a T/R (transmitter/receiver) cell and then, for the 3–cm unit, through a waveguide (and, for the 10–cm, unit through a coaxial cable) to the antenna array, where the RF energy is transmitted into the atmosphere. A small fraction of this transmitted energy returns, or echoes, back to the antenna and back down the waveguide (or coaxial cable) again. The same T/R cell then directs this much weaker returning energy into receiver mixer crystals; the T/R cell is designed and is able, when functioning properly, to prevent the stronger, outgoing RF energy from passing through and thereby damaging these delicate mixer crystals. A klystron sends another, "base line" RF signal into the mixer crystals. "Mixing" these two incoming signals, the mixer crystals produce useful electronic information, which is then finally sent to the display unit. The modulator, magnetron, T/R cell, mixer

---

**3.** Very simply described, an ARPA processes data from its attached radar unit and generates predictive vectors and other ship movement information for helping the crew avoid collisions. *See In re Ocean Foods Boat Co.,* 692 F.Supp. 1253, 1257 (D.Ore.1988). *See generally* 33 CFR § 164.38. Thus, an ARPA itself is not considered a "separate radar system" from the radar unit to which it is attached.

**4.** Shell's counsel sought to have one of the ship's officers estimate from the ship's logs the number of hours the 3–cm unit had been in operation between June 15, 1982 and June 5, 1983. The Court refused to admit such testimony for failure to lay a proper foundation: the logs for the entire period were not offered in evidence and this officer had not been on the ship continuously for this entire period, and thus his answer would have appeared speculative. Shell made no proffer. *See* Tr. II:18–21.

**5.** The various pieces of this overview paragraph can be gleaned obliquely from the testimony of the radar technicians and experts and from the service manuals in evidence. The Court notes, however, a good compiled overview published just one year before the DIALA's two radar units were installed. *See Radar,* 18 ENCYCLOPEDIA BRITANNICA 993–1019 (1972).

crystals, and klystron are all components of the MTR unit.

There are generally two types of T/R cells used for 3–cm radar units: the older 1B63B type and the newer, interchangeable VDX–1047S type. *See* Tr. III:75–77;[6] Exh. P26(B), at 5–12. The operator's manual states that the newer type has a 5000–hour average life expectancy (ALE); while not stating the older type's ALE, the manual indicated that the newer type's ALE is longer than the older type's. *See ibid.* The manufacturer of the newer type lists its average *minimum* life expectancy as 2000 hours. *See* Tr. III:78. According Mr. Stakelum, what these two figures mean is that the newer type can be expected to remain operational for any period of time between 2,000 and 5,000 hours of radar use. *See* Tr. III:78–79. He added that, unlike the older type, the newer is susceptible to possible damage by electrical storms. *See* Tr. III:77. He also testified that it was "industry practice" to replace T/R cells on failure, and not earlier unless a technician by chance through testing with a volt meter finds "they're in danger of imminent failure." *See* Tr. III:80–81; *see also* Jens Pedersen's Depo., R.Doc. 39, at 32 (Pedersen:*xx*). He qualified his statement, however, by adding that a technician may replace a T/R cell without evidence of damage if he knows that it has had over 5000 hours of use. *See* Tr. III:81–82.

When a radar unit is not functioning properly, a white spot may appear on the center of the display screen and render the unit unfit for use. There are various sources for this problem: a defective magnetron, a defective modulator, blown or defective mixer crystals, possibly a defective klystron, or water ingress into the waveguide. *See* Tr. III:68–69. According to Michael St. Romain, the radar service technician who repaired the 3–cm unit on the voyage at issue here, a white spot on the display screen "usually" indicates the

presence of water in the waveguide. *See* Tr. IV:58. According to Jens Pedersen, the young radar service technician who had inspected both units in 1982, a center spot "normally" means a faulty T/R cell. *See* Pedersen:141. Captain Schätzel testified that service technicians on board over the years had told him that "a bright spot in the middle of the display was pointing to some water having entered the waveguide of the radar." *See* Tr. I:95.

Another possible problem a radar unit may have is a weak display picture. The evidence identifies just two causes of this second problem: either a malfunctioning magnetron or water in the waveguide. *See* Pedersen:121; *cf.* Tr. III:100.

A defective klystron may damage the receiver mixer crystals. *See* Tr. III:56. But imminent damage is not inevitable: Mr. St. Romain's report, set forth on page 33 below, shows that, just after he installed new crystals, he installed a defective klystron that did not cause the new crystals to blow out.

When a T/R cell fails so that it does not distinguish between the high power transmitting RF energy and the much lower power returning RF energy, this transmitting energy may pass directly into the receiver mixer crystals. For such T/R cell failures, the mixer crystals will blow out immediately. *See* Tr. III:55; IV:64. When the sole problem is a T/R cell failure accompanied by a mixer crystal blow-out, a small white spot no bigger than a 25¢ or 50¢ coin will appear on the center of the display screen and the rest of the picture on the screen may disappear. *See* Tr. III:55; IV:64–66.

Water is a constant concern. *See* Tr. III:67. When water is present in the waveguide, it may act as an unwanted, premature, close-range reflector for much of the strong transmitting RF energy. While not entirely clear, Mr. Stakelum appears to suggest that reflected RF energy caused

---

**6.** The abbreviation "Tr. III:*xx*" refers to page *xx* of the third volume of the trial transcripts, Record Document No. (R.Doc:) 54; the abbreviation "Tr. I:*xx*" to the first volume, R.Doc. 53; the abbreviation "Tr. II:*xx*" to the second volume, R.Doc. 47; and the abbreviation "Tr. IV:*xx*" to the last volume, R.Doc. 55. By citing to a particular page of testimony or to a particular document as support for a particular point or finding, the Court does not mean to imply that the Court always relied *solely* on that page or document for *each* such point or finding.

by water in the waveguide "can pass through" the T/R cell without damaging it but still damage the mixer crystals. *See* Tr. III:100. As little as a few drops of water (1–2 cc) can cause a white spot in the center of the display screen. *See* Tr. IV:58–59, 116. Depending on the amount of water in the waveguide, this spot "would be considerably larger" than the small spot that appears from the mere failure of a T/R cell and a mixer crystal. *See* Tr. IV:66; *see also* Pedersen:129 ("a big center spot" from water); *cf.* Tr. III:99–100.

There are generally three sources for water ingress into the waveguide: through flanges or seams on the waveguide, through the front or edges of the fiberglass scanner array unit (to which the waveguide connects), and through the rotary ball bearing components just above or below the scanner.[7] *See* Tr. III:65, 98; IV:59, 133. Because the antenna cover is continuously exposed to the harsh elements of the maritime environment, it may become soft and porous over time or otherwise in need of fiberglass recoating to prevent water leakage into the waveguide. *See* Tr. III:96–97; *cf.* Tr. IV:59.

If enough water enters the waveguide and travels down into the MTR unit, then this standing water generally affects the magnetron and modulator first; apparently, however, standing water does not itself cause a T/R cell to fail, *see* Tr. III:67–69. According to Placid's radar expert, Mr. van Wyck, if only a small amount of water enters the waveguide while the transmitter is emitting RF energy, this water may dissipate within minutes from the heat generated by this energy. *See* Tr. IV:121. According to Mr. Pedersen, it takes several hours for water to boil off this way, *see* Pedersen:129–130; it is unclear, however, how much water he was considering for his statement as being initially inside the waveguide.

In 1973, the DIALA was also equipped with an interswitch device, which permits the antenna and MTR unit on one radar system to be operated with the display unit of the other. *See generally* Exh. P27, figures 1–2 (schematic drawings of the interswitch). To change from the regular mode (i.e., where the 10–cm/ARPA display operates solely with the 10–cm MTR unit and antenna, and the 3–cm display operates solely with the 3–cm MTR unit and antenna) to a crossed mode (i.e., where the 10–cm/ARPA display operates instead with the 3–cm MTR unit and antenna, and the 3–cm display operates instead with the 10–cm MTR unit and antenna), both systems must be turned off for at least three minutes. *See* Wolfgang Born's Depo., R.Doc. 42, at 33, 89–90 (Born:xx); Pedersen:39. This interswitch device is rarely used; none of the DIALA's crew had ever operated the interswitch device before the voyage here. *See* Tr. I:82; Rüdiger Thrun's Depo., R.Doc. 43, at 30 (Thrun:xx).

Inside (or near, *cf.* Pederson:111–112) at least a portion of the interswitch unit are printer circuit boards (PCBs). According to Mr. van Wyck, the contacts for PCBs should be checked for tightness of fit and cleaned as necessary. *See* Tr. IV:122–123. He suggested that the operator's manual provides for such checks, *see* Tr. IV:123, but added that a check "is an ad hoc event rather than a periodic or scheduled event," *see* Tr. IV:125; *see also* Tr. III:41. Under the caption "Connectors" in the section on "Preventive Maintenance," the manual for the 10–cm unit provides: "Check fastness ... of PCB connectors." *See* Exh. P26(a), at 5–1. According to Mr. Stakelum, if as here a PCB relay is sealed in a contact case, the relay cannot be visually inspected before its failure. *See* Tr. III:40–41. Based on the slim evidence here, however, the Court must reject Mr. Stakelum's inference that it is impossible to inspect the relays before their failure: if, as Mr. Stake-

---

**7.** The Court rejects Mr. Pedersen's testimony that water cannot enter the waveguide ultimately through a bad bearing on the antenna's turning mechanism, *see* Pedersen:126–127. On the one hand, both sides' radar experts testified otherwise, as did Mr. St. Romain (who works in Louisiana's wet climate). On the other hand, Mr. Pedersen has had no training in bearing repairs and his firm does not do antenna overhauls, where bearings are replaced. *See* Pedersen:125, 162.

lum suggests, a serviceman can open the contact case and replace such a relay after its failure, then the Court would need more evidence than was presented here in order to find that a serviceman cannot also open the contact case beforehand merely to inspect the relay; in other words, there is no basis to infer—as Shell would—that opening a contact case for inspection may itself cause damage.

2. Shell's maintenance and repair policy

The manufacturer's Operators and Simplified Field Service Manuals, which were kept on the DIALA, see Tr. I:64, contain the same recommendation in a blocked-off "WARNING" box: "All work[s] performed on the radar must be carefully recorded on the radar log book." See Exh. P26(A), at 5–1 (for the 10–cm unit); Exh. P26(B), at 4–1 (for the 3–cm unit).

Notwithstanding this strong recommendation, Shell did not have the DIALA's crew keep a radar log book until 1986, when the DIALA was reflagged under a Liberian flag and thus was required under Liberian regulations to carry such a log. See Tr. I:34, 66; II:40, 51. Surprisingly, Martin Buck, a Shell superintendent in charge of the overall maintenance of Shell's many vessels including the DIALA, denied any manufacturer's recommendation for keeping such a log, see Tr. III:9, and Captain Schätzel had been unaware of any such recommendation, see Tr. I:66.

Captain Schätzel stated that it would be prudent marine practice to maintain such a log. See Tr. I:66–67. Other officers unequivocally agreed that a manufacturer's recommendations should be followed, see Thrun:44; Born:98, as did both radar experts, see Tr. III:105; IV:110. Superintendent Buck agreed that such recommendations should be followed "in principle." See Tr. III:10. Placid presented uncontradicted expert testimony that it is standard in the maritime shipping industry to maintain such radar logs on a vessel. See Tr. IV:76.

Shell did, however, have the DIALA keep certain limited records relating to radar maintenance and repair. Specifically, in a Gerätetagebuch (equipment diary) aboard the DIALA were kept copies of service reports that outside technicians rendered whenever they would do any inspection, work, or repair on a radar unit. See Tr. I:33; II:22. When the vessel ordered actual repairs by an outside technician, a crew member would generally direct the technician to this book so that the trained technician could better learn what work or trouble earlier technicians had had.

Until a separate radar log was also maintained beginning in 1986, this book was the only written record aboard the DIALA of what work had been done on the radar units and of what parts had been replaced. See Thrun:8. It was the duty of the captain and the equipment officer (who at the time was Stephan Schuster, a Shell employee who did not testify) to keep this book complete. See Tr. II:40. It was Shell's apparent policy or at least practice, however, that small items such as a fuse replacement by a crewmember were not recorded in this book. See Tr. II:3; III:11. Thus, service technicians might not know about any such replacements—or about any new problems or whether any prior described problems were continuing—unless the captain or equipment officer orally advised the technician. Cf. Tr. III:12; Thrun:36. Thus, whenever there would be a crew change between the DIALA's permanent and relief captain or equipment officer (such as in April 1983, when Captain Schätzel relieved Rüdiger Thrun, the DIALA's permanent master at the time), such oral advices might be second-hand. As Captain Thrun's testimony that, on his return, all he was told was "that both sets are working" shows, see Thrun:50, this word-of-mouth system is far from perfect.

The DIALA's crew lacked technical training and expertise in the maintenance and repair of radar equipment. For example, the crew could not read the wiring diagrams in the manufacturer's radar manuals. See Thrun:46; cf. Tr. I:79–80; Thrun:38. The crew relied on expert service technicians to do any repairs, beyond perhaps replacing simple fuses. See Tr. II:4–5; Thrun:8. There is, however, no evidence that other vessels generally have or

should have a crewmember with technical radar skills.

The manufacturer's operations manuals set forth at least three [8] steps for "routine maintenance" on each unit: (1) each month, someone should check that the antenna cover has not been painted, check the oil level for antenna motor and add oil as necessary, listen to the antenna for abnormal noises, and clean the air filters; (2) every year, the oil in the antenna pedestal should be changed; and (3) "[e]very two years or 5000 hours of operation the Antenna should undergo a general overhaul and lubrication." *See* Exh. P26(A), at 5–2 to 5–4; P26(B), at 4–3 to 4–6. The manual for the 3–cm unit contains the following elaboration for this biannual overhaul:

> During overhaul all ball-bearings and oil seal rings should be replaced; this will ensure reliable operation for the next two years.

. . . .

The overhaul of the antenna base requires the unit to be removed from the mast and brought to a workshop.

*See* Exh. P26(B), at 4–6; *see also* Exh. P26(A), at 5–4 (very similar elaboration in the 10–cm manual). To complete this overhaul takes a few days. *See* Tr. IV:81; *cf.* Pedersen:162–163. With no explanation why, Mr. Stakelum suggested he disagreed with this last recommendation. *See* Tr. III:104–105. Mr. Pedersen testified that the manufacturer instructed him (and others at a seminar the manufacturer had given in late 1981) not to overhaul antennas on any fixed time schedule, *see* Pedersen:46–50; he further explained, however, that he has had no training in bearing repairs and that his firm does not perform antenna overhauls but instead directs such overhauls to the radar manufacturer, *see* Pedersen:125, 162; also, it is unclear whether this instruction to him concerned just newer antenna models, *cf.* Pedersen:49, or just persons untrained in antenna overhauls.

The DIALA's equipment officer would perform the recommended monthly check. *See* Born:59–61. He would not, however, open up either unit for checking any components inside. *See* Born:100. It is unclear what written notation, if any, would be made concerning these inspections. There is no evidence that annual oil changes were ever performed by either a Shell employee or an outside radar serviceman. *See* Tr. IV:112–113.

Every three months, the chief officer would prepare a quarterly report that was sent to Superintendent Buck's office in Hamburg. In preparing the report's entry on the radar equipment, the chief officer would meet with the radar equipment officer in order to notate any problems or repairs that the radar units had had any time since the last quarterly report. *See* Tr. II:22; Born:56–57. Like copies of the service reports themselves, these reports are sent to Superintendent Buck's office. *See* Tr. II:66–67.

Captain Thrun testified that any problems, repairs, or work at any time during the three-month period are to be notated in this report. *See* Thrun:32, 57–58. Unobjected testimony about the entries in certain earlier quarterly reports, *see* Tr. IV:78, corroborates the captain's testimony. So does the entry in the December 1982 quarterly report in the record: "keine Störungen seit der Werft" (which the witnesses translated: no problems, or failures, since the shipyard, or drydock). *See* Exh. P25(A), entry 33, at 6; *see also* Tr. II:39, 67; Thrun:32; Born:57. Thus, the Court specifically rejects Superintendent Buck's self-serving testimony that only "unsolved" problems be notated in these reports. *See* Tr. II:67.

Shell's witnesses testified that the DIALA underwent a drydock overhaul about every two years and, specifically, had undergone such in February 1990 and August 1982; they implied that the radar units

---

**8.** The manuals include a fourth, semi-annual step for cleaning any DC motors that may run any of the radar equipment. *See* Exh. P26(A), at 5–2 to 5–3; P26(b), at 4–4 to 4–5. While there is no evidence of any semi-annual cleaning of motors, *see* Tr. IV:112, the record does not reveal whether any radar motors on the DIALA ran on DC (versus AC) current, *see* Tr. IV:132.

themselves were specifically overhauled during these drydocks. *See* Tr. II:59–60, 63–65; Thrun:31. On cross-examination, however, Superintendent Buck admitted that he only *assumed* that the last overhaul of the radar antennas was in February 1980 and that he had no independent documentation or other information that they were *in fact* ever taken down any time between February 1980 and the voyage at issue here. *See* Tr. III:23–25. Chief Officer Wolfgang Born characterized the radar's bi-annual service call as no more than "a general checkup." *See* Born:63. Further, Shell introduced no testimony that it had requested, or the antenna units otherwise underwent, any such overhauls at any time before 1980. Finally, even considering the possible request in January 1980 for an antenna overhaul,[9] the service reports for the February 1980 drydocking do not clearly indicate that either antenna was in fact taken down and overhauled at that time, *see* Exh. D3(4); indeed, the March 1980 service report described three paragraphs below strongly suggests the contrary.

During these bi-annual drydockings, the DIALA underwent a classification survey by the German Hydrographic Institute. As part of the survey, the surveyor gives each radar unit an operational check and, if the unit appear to function properly, applies a certification sticker to the unit. *See* Tr. I:32, 64; II:65. There is no evidence, however, that these surveyors have technical radar expertise, open up the radar components, are shown the Gerätetagebuch, perform a visual or aural check of the antennas above, or are told about any problems either unit may have had since the last classification survey.

### 3. The radars' repair and maintenance history

Superintendent Buck was unaware of any practice or recommendation to replace radar parts before they wear out.[10] *See* Tr. III:2.

A March 1980 service repair report for the 3-cm radar unit noted "signs of rust and water ingress from the top bearing" and, despite the lack of continuing abnormal noises, recommended that this bearing be replaced as soon as possible. *See* Exh. D3(6). Yet Superintendent Buck was unaware of this report; he could point to no record that, at any time before the grounding, Shell had ever had this condition corrected or even specifically looked at, notwithstanding that Shell had had over two dozen service calls made on the radar units between the issuance of that report and the voyage here. *Compare* Tr. III:3–5 *with* Exh. D3(7)–(42). As far as Captain Thrun knew, it was not until after the grounding

---

**9.** Pointing to Exh. D3(3), Shell's counsel suggested at trial that a work order Shell sent to Krupp–Atlas in January 1980 indicates that Shell had specifically requested an "overhaul" for the two radar units; he contended that the exhibit's English translation is erroneous, that the German word "Überholung" in the work order should have been translated as "overhaul" and not as "inspection." *See* Tr. IV:94. Upon Placid's objection that Shell's counsel was attempting to testify, the Court ruled that any such correction (even if otherwise cognizable in light of the document stipulation indicating in effect no objections to the translation of this work order, *see* R.Doc. 46) would have to be brought out through the testimony of a witness, not through counsel himself. *See* Tr. IV:96. While Shell called a rebuttal witness in part to give testimony about the English translation of the German word "Hohlleiter," *see* Tr. IV:137–138, Shell never sought to elicit testimony about the correct translation of the German word "Überholung." In any event, the dispute is immaterial: the point the Court stresses is that

Shell presented no firm evidence that an antenna overhaul was in fact done, whether or not Shell may have requested an overhaul beforehand.

**10.** Superintendent Buck attended periodic meetings with superintendents from other shipping companies and there discussed general shipping matters. *See* Tr. II:60. According to Superintendent Buck, these other representatives stated their practice about replacing or not replacing radar component parts. *See* Tr. II:62. The Court sustained Placid's objection to Superintendent Buck's testifying about any industry practice in this regard. *See* Tr. II:61. On the one hand, the testimony about what other persons stated at these meetings would be uncorroborated hearsay from unknown persons Placid could not cross-examine. On the other hand, Superintendent Buck was never tendered as an expert in shipping practices, and there is no hint that Shell gave Placid's counsel an expert report putting Placid's counsel on reasonable notice of this issue.

that the bearing was ever replaced, or even that either antenna was ever taken down. *See* Thrun:78–79.

In August 1982, as part of the DIALA's bi-annual drydocking, a young Svensk Marin Radio AB radar serviceman, Jens Pedersen, inspected the radar units and, according to his service report (he had no independent recollection of this inspection, *see* Pedersen:80–81, 168–169), found no problems with the radar units other than with two receiver crystals, which he replaced. He did not, however, disassemble or overhaul the antennas. *See* Pedersen:162; Tr. III:104. Further, Shell appears not to have specifically advised him, through the Gerätetagebuch or otherwise, of either the earlier documented water-related antenna problem or any other problem whatsoever. *See* Pedersen:23, 75–76; *cf.* Thrun:18 (Captain Thrun was not present). For example, Shell appears not to have advised Pedersen that just the previous month a repairman had recommended that a component in the 10–cm display unit be replaced. *Compare* Exh. D3(37) *with* Pedersen:143–144. While he explained that his practice was to perform a "feel" test on the fiberglass antenna front *if* it visually appeared in disrepair, *see* Pedersen:142, he was never directly asked whether, and did not state that, he would *always* run his hand across the antenna front to determine whether it was porous or otherwise in need of repair for water leakage. *Cf.* Pedersen:53, 124. His whole inspection, which was for both radar units as well as for a directional finder device with which he was generally unfamiliar, lasted only five hours. *See* Pedersen:87–88. If he had been told about any intermittent or uncorrected problems, he would have kept the two radar units running for several hours in order for a more thorough inspection. *See* Pedersen:135–136.

Between Mr. Pedersen's inspection and the end of 1982, at least three service calls were made for the radar units. *See* D3(39)–(41). Yet in Chief Officer Born's December 1982 quarterly report, he specifically noted no prior problems with the radar since the drydocking. *See* Exh. P25(A), at 6. Superintendent Buck denied recalling any problems during this period. *See* Tr. III:2.

### C. *The voyage*

As quoted on page 765 above, Fruin's May 10th telex indicated a "40 foot fresh water draught in the Mississippi." On May 19th, Shell's local New Orleans agent, Lykes Bros. Steamship Co., advised that, effective May 18th, the Bar Pilots (that is, the compulsory river pilots who operate at the mouth of the Mississippi up to Pilottown) recommended a maximum loading draft of "39 feet" at Southwest Pass for vessels (like the DIALA) with a deadweight, or cargo-carrying, capacity less than 100,000 tons. *See* Exh. P4(3). Because Southwest Pass is at the mouth of the Mississippi River and has fresh water flowing out of it, the Court infers that this recommendation is for a 39–foot *fresh-water* draft. Telexes to Lykes Bros. confirm that the DIALA's crew drew the same inference. *See* Exhs. P4(1)–(2).

Shellimar in turn advised the DIALA's crew to load the DIALA with as much oil for a 39–foot fresh-water arrival draft at Southwest Pass. *See* Tr. I:38; III:29. Calculating the amount of bunkers and potable water that the DIALA would expend on the trans-Atlantic portion of the voyage, Chief Officer Born calculated how much cargo the DIALA could take aboard in order to meet this safe arrival draft. *See* Born:69–70; Tr. I:39; II:5–7.

On May 21, 1983, the DIALA completed loading 58,548 metric tons of Brent blend crude oil. *See* Exh. P2. Upon completion, the DIALA had a 38½–foot even-keel saltwater draft. *See* Exh. P5, at 51; Tr. I:39; II:6. This draft was sight-checked. *See* Tr. II:6, 8. Captain Schätzel then advised Lykes Bros. by telex that the DIALA would be arriving at Southwest Pass with a 39–foot freshwater draft. *See* Exh. P4(1)–(2).

Around 5:30 p.m., about half an hour before the DIALA set off for Port Allen, First Officer Helmut Bork performed a quick operational check of various bridge equipment, including the two radar units. *See* Tr. I:40–41; II:24–25, 41. In the ves-

sel's movement book, he notated all the equipment was okay. *See* Exh. P6, at 13, at 17.30; Tr. II:25.

The trans-Atlantic portion of the voyage was uneventful. The weather was generally good, with occasional passing rain showers. *See* Born:18; *see also* Exh. P5, entries for 21 May 1983 to 4 June 1983, column 5. No one recalled any radar problems on the ocean voyage. *See* Tr. I:42; II:26; Born:17. However, the crew apparently kept the two radar systems on "stand-by" on most of this portion of the voyage. *See* Born:16.

Upon nearing Southwest Pass, the actual amount of bunkers and water consumed was measured and the safe arrival draft computation was reconfirmed. *See* Tr. II:6. These adjusted calculations computed a 38-foot *sea-water* draft just outside Southwest Pass. *See* Exh. P6, at 14, top entry; Tr. I:42–43; Born:116. Because salt water is denser than fresh water, the DIALA's 38-foot salt-water draft is equivalent to a 39-foot fresh-water draft. *See* Tr. I:39.

On June 5, 1983, around 1:50 a.m., the DIALA picked up the first of three compulsory river pilots, New Orleans Bar Pilot Wayne Cucullu. Around 2:17 a.m., the DIALA entered the Southwest Pass of the Mississippi River and proceeded up the river. At the time, the river was in high, flood water stages and had a swift current around 6–7 knots. *See* Tr. IV:16–17.

Sometime thereafter, a "vibration" went through the DIALA. Because Officer Bork was not yet on duty for his 4–8 watch, *see* Tr. II:26–27, the Court determines that this vibration occurred before 4 a.m. Chief Officer Born estimated that the vibration lasted around two minutes; while he characterized it a "stronger" vibration, he gave uncontradicted testimony that such vibrations were not unusual in shallower waters. He attributed the vibration to the DIALA's passing over a shallower patch in the water course. *See* Born:19–20; 75–76. Similarly, Captain Schätzel attributed it to a change in the DIALA's underkeel clearance from deeper to shallower waters. *See* Tr. I:45, 76.

According to Captain Schätzel, Pilot Cucullu used the slang expression "scraping barnacles" in connection with this vibration. Captain Schätzel understood the expression to mean that "there was some silt or something underneath" that was "knocking barnacles off of the bottom of [the] keel." *See* Tr. I:76.

During this vibration, Captain Schätzel was standing at the 10–cm dispute unit, when "suddenly the picture went off." *See* Tr. I:45. Thereafter, he turned off the entire 10–cm unit and turned on the 3–cm unit, which had been switched to "stand by" when Pilot Cucullu came aboard. *See* Tr. I:46, 74, 77.

Around 5:10 a.m., the second compulsory pilot, Crescent River Port Pilot Charles Clasen, took Pilot Cucullu's place. Around 5:45 a.m., Captain Schätzel radioed Lykes Bros. for service repairs on *both* units; according to him, the 3–cm picture had a "weak picture." *See* Tr. I:47–49, 83–84; Exh. P8. For no reason explained in the record, no serviceman came aboard any time later that day.

Around 2:50 p.m., the third and final compulsory pilot, New Orleans and Baton Rouge Steamship (NOBRA) Pilot Louis Lahners, took Pilot Clasen's place. It is disputed whether Captain Schätzel advised Pilot Lahners at that time that the 10–cm radar unit was not operating. *Compare* Tr. I:50, 77 *with* Tr. IV:29–30, 40, 54. Captain Schätzel himself admits, however, that he made no mention about the 3–cm radar unit's weak picture. *See* Tr. II:11. In any event, because of the relatively good visibility as late as 5:00 p.m., the crew was not using the 3–cm unit at that time. *See* Born:78.

Around 6:00 p.m., as the DIALA was rounding St. Rose Point, Pilot Lahners spotted an approaching squall. *Compare* Tr. IV:18 *with* Exh. P6, at 15 (indicated Mile Marker 119 at 17:52) *and* Exh. P13(b). Pilot Lahners asked Officer Bork to turn on the radar. *See* Tr. II:30–31, 45; IV:18. Officer Bork went aft, presumably to turn on or adjust the 3–cm unit. *See* Tr. IV:19. Preferring to stand near the windows at the front of the bridge, *cf.* Tr. II:46, Pilot

Lahners did not yet go aft to the 3–cm display unit.

Around twenty minutes later, as the DIALA was approaching the Luling Bridge, Pilot Lahners made a passing agreement with a downbound tug carrying a tow around 400 feet long. *See* Tr. IV:20, 23. Just after the DIALA passed under the bridge, the squall overtook the vessel and visibility became bad. Pilot Lahners asked to see the 10–cm display. *See* Tr. IV:20. Officer Bork stated that the 10–cm unit up front was out, but advised that Pilot Lahners could use the 3–cm unit in the back. *See ibid.;* Tr. II:31. Pilot Lahners went back to the 3–cm unit where Captain Schätzel was adjusting various knobs. *See* Tr. I:51; II:31; IV:20. According to Captain Schätzel, the picture had considerably worsened from the morning. *See* Tr. I:51. When Pilot Lahners looked at the screen, the picture had faded out completely; he saw nothing more than a small white dot in the center. *See* IV:20, 34; Exh. D8, at 1. Pilot Lahners immediately radioed the downbound tug that all radar was out and that he had lost complete eyesight of the tug and tow; he thus urged the tug to try to keep as far away as it could. *See* Tr. IV:21. Luckily, through Pilot Lahners's deadreckoning skills in this *in extremis* situation, no collision occurred.

The blinding squall passed within a few minutes, *see* Tr. I:53; II:32, IV:21, but the radar remained out. The general overcast/rainy weather remained similar, with intermittent light showers the rest of the evening. *See* Tr. IV:23; Born:27, 35; Exh. P5, June 5th entry, column 5 ("o/r," standing for overcast/rain, at 20:00 and 24:00). None of the witnesses testified that he saw lightning or heard thunder any time during this squall or at any other time.[11]

Pilot Lahners was uneasy and upset by this uncontrollable near-miss. *See, e.g.,* Tr. I:54; II:33; IV:21–22. He blamed the crew

for what he perceived as their not telling him earlier that both radars were out. In the journal he carried on the vessel, he wrote: "Both radars inoperatable [sic]. Captain & mate told me they were working. Near collision because they lied." *See* Exh. D9; Tr. IV:31.

Within minutes of this encounter, *compare* Tr. IV:24 *with* Exh. P6, at 16 (passing Buoy 123A, across from 26 Mile Point, at 18:37) *and* Exh. P13(c), Pilot Lahners radioed the Coast Guard to advise that both radars were out and that he would seek to anchor the DIALA at the next open fleeting area. *See* Tr. I:54; IV:24. Because the Bonnet Carré Spillway was open to release high waters from the river, the Bonnet Carré Anchorage was closed. *See* Tr. IV:25. The next open one was the LaPlace Anchorage, near Mile Marker 135. *See ibid.;* Exh. P13(d).

Some time later, *e.g.,* Tr. I:54, Captain Schätzel called Chief Officer Born to the bridge to try to use the interswitch unit, which—to repeat—they had never used before, *see* Tr. I:82. After two or three attempts, the two managed to obtain a picture by interswitching the 10–cm antenna and MTR unit with the 3–cm display unit. *See* I:54–55, 81; Born:31–33, 88–91. The display was good, *see* Born:34, 94; Tr. II:36; Captain Schätzel testified that the picture was "brilliant" and "better than the one before," when he had seen it in the early morning, *see* Tr. I:55, 60. Around 7:50 p.m., as the vessel was rounding Mile Marker 130 at 35 Mile Point, Captain Schätzel informed Pilot Lahners about the interswitching. *Compare* Exh. P6, at 16 (entry for 19:51) *and* Exh. P13(d) *with* Exh. D8, at 2. Pilot Lahners looked at the screen and confirmed that the display appeared good. *See* Tr. I:56; II:36; Exh. D8, at 2. Concerned about the safety of the DIALA and other vessels, *see* Tr. IV:50–51, he none-

---

11. Mr. Stakelum testified that he read a reference to thunder in one of the depositions in this case. *See* Tr. III:102. No such reference appears in any of those portions of the depositions offered at trial. In any event, even if there was evidence of lightning and thunder, the testimony would be immaterial as far as the radar is

concerned. On the one hand, Mr. Stakelum testified that lightning and thunder do not affect the older T/R cell type. *See* Tr. III:77. On the other hand, the Court would be speculating if it tried to determine whether the T/R cell in 3–cm on that day was an older or newer type. *See* page 779–780 below.

theless still insisted on anchoring, *see* Tr. I:56; II:36; IV:50; Born:112, 119.

At 8:48 p.m., the Coast Guard sent a telex to Lykes Bros. for forwarding to the DIALA. The telex reads in pertinent part:

It has been reported that your vessel is operating in U.S. waters with only one of the two installed radars operable. Federal Regulations 33 CFR 164.37 require two operable marine radars on your vessel. The Captain of the Port, under authority of 33 CFR 160.111 orders your vessel not to depart the Port of New Orleans.

This deficiency must be corrected and the Captain of the Port advised of the repairs or installation prior to your vessel's departure from the Port of New Orleans via Easy Link Telex 701801 (USCG NOLA). Additionally, should your one radar fail to operate properly, the movement of your vessel will be restricted to daylight hours only, with a visibility of at least two miles....

*See* Exh. P9. The Court rejects Shell's inference that this telex was in essence a confirmation of a conversation between the Coast Guard and Pilot Lahners. Not only does the telex make no mention of Pilot Lahners, but also the DIALA was almost twenty miles, if not more, upriver from New Orleans by the time Pilot Lahners radioed the Coast Guard, and the sky is always already dark around New Orleans at 8:48 p.m. in the first week in June. Further, Shell produced no documentary evidence, from either the DIALA's or Lykes Bros.' files or otherwise, that the contents of this telex were communicated to the DIALA's crew by another telex or otherwise. *See also* Tr. I:56–57, 70; II:12.

When the DIALA arrived at the LaPlace Anchorage around 9 p.m., the port anchor was dropped. Before the DIALA was positioned to drop its starboard anchor, the high water current of about six knots caught and swept the DIALA downstream out of control to Bonnet Carré Point, where the DIALA grounded at 9:40 p.m. During anchoring and until grounding, all orders were executed properly and there was no equipment failure. *See* Pretrial Order, R.Doc. 35, § 7(11), at 8.

Extensive salvage efforts were undertaken, and the DIALA was finally refloated a week later on June 12th; it is the cost of these salvage efforts for which Deutsche Shell seeks general average contribution from Placid. Thereafter, the DIALA discharged the full cargo, undamaged, at Placid's refinery at Port Allen by June 15th. No security was obtained from Placid, or anyone else, for the unconditional release of this cargo.

### D. *The radar repairs on the voyage*

Sometime after the grounding, Captain Schätzel called for a radar service technician to repair the two radar units that night. At 2:00 a.m. on June 6th, Mr. Ben Kempf of ITT/Mackay (a division of ITT Telecommunications Corp.) came aboard; he remained aboard until 4:20 a.m. *See* Exh. D3(43); Exh. P6, at 18. Busy with refloating attempts when Mr. Kempf came aboard, Captain Schätzel simply asked Mr. Kempf "to do his best in repairing" both radars. *See* Tr. I:89–90.

Mr. Kempf did not testify. His work order contains the following entry (with just spelling errors corrected):

arrived aboard ship; and found RADAR inoperative; tried interswitching transmitter and antenna unit but no success. checked radar indicator; and found no trigger to indicator traced problem to loss of trigger at interswitch pulled pcb [printer circuit board] cleaned contacts and replaced relay with ship's spares; restored so SALSMAR 16″ indicator [10–cm/ARPA display] to operation; checked all other positions of interswitch. all normal. retuned transmitter 1645. operation normal.
RAYTHEON 162 0–12 X RADAR; the transmitter is inoperative; all power supply voltages are normal; replaced blown receiver mixer crystals; but still no targets; replaced klystron with ship's spare; crystal current appears normal at this time but still unable to tune. no other replacement parts are available. suspect both klystrons 2K25 are defective; because it was necessary to decrease crys-

tal attenuation to achieve any reading of receiver mixer crystal current. No t/r cell replacement aboard ship; suspect water in waveguide or in array. disassembled waveguide at transmitter but no water there. removed waveguide from array to center of pedestal; but no evidence of water intrusion. will return tomorrow to finish repairs.

Exh. P20–P21; D3(44).

Despite his last comment, Mr. Kempf did not return; instead, his co-employee Michael St. Romain came aboard later that same day, when he succeeded in obtaining a 24–mile range picture on the 3–cm display, and returned the next day, when he treated both antenna units with a $24.50 fiberglass recoating kit. *See* Exh. P16; D3(45). His work order contains the following entry for his first visit on the vessel:

> Picture on radar showed signs of water in waveguide very weak picture and large spot in center. No evidence of water could be found down below. Removed scanner and inspected upper assembly. Some slight evidence of water was shown from scanner. The front of scanner in dire needed recoating. It is very porous and could get water inside during a severe storm. Recommend recoating. Also noted that the top bearing is badly worn and should be replaced. Master requested that we obtain necessary parts and they will replace bearing. After reassembling waveguide parts a very slight improvement in picture was noted, but not enough. Changed defective TR cell and blown crystals. This improved picture further. Tuning of klystron cavity showed no change in picture. Changed klystron from ship's spares. This improved picture further. now out to 6 miles. Made several other checks in TR unit with no help in picture. Changed out klystron with one from our kit. Tuned up radar now to have targets 24 miles.

Exh. P16; D3(45). His entry for the second day was shorter:

> 6/7 Obtained necessary materials to coat scanners.... Arrived and coated both 10 & 3 cm scanners with fiberglass coating. Checked operation of both radars. Operation normal.
>
> . . . .
>
> Master request that rebuilding kit be sent to agents for them to install. Pedestal rebuild kit was not available from NPC.

Exh. P17; D3(46). At trial, Mr. St. Romain gave two reasons why the top bearing for the scanner should be replaced: to prevent the turning mechanism from seizing up and to prevent water leakage. *See* Tr. IV:61. Mr. St. Romain attributed two causes for the loss of picture to the 3–cm unit he repaired: first, water intrusion; and second, "the T/R cell and klystron." *See* Tr. IV:62.

Placid's radar expert, Samuel van Wyck, expressed the opinion that preventative maintenance through ad hoc inspections and cleanings of the PCBs could have prevented the failure of 10–cm unit. *See* Tr. IV:123, 125. While admitting a lack of absolute certainty, he expressed the further opinion that water ingress through the scanner from its porous front and/or its unattended-to upper bearing was a probable cause of the 3–cm unit's failure, *see* Tr. IV:133–134, and that an overhaul of the antenna unit would likely have corrected and prevented these water-related problems, *see* Tr. IV:124–125.

Shell's radar expert, Tom Stakelum, expressed the opinion that the defective relay causing the 10–cm radar unit's failure could not have been detected beforehand. *See* Tr. III:40–41. He believed that the 3–cm unit failed solely because its T/R cell had reached its useful life and that this failure would not have been reasonably discoverable beforehand; he added that the T/R cell's failure was possibly hastened by an electrical storm. *See* Tr. III:54–55. He believed that the 3–cm unit's original klystron that Mr. Kempf had replaced was not defective. *See* Tr. III:56. While admitting that the 3–cm scanner was porous when the DIALA left Sullom Voe, *see* Tr. III:106, he believed that water ingress was not a contributing cause of the 3–cm unit's fail-

ure inasmuch as no MTR transmitter components were found damaged, *see* Tr. III:69–70.

In reaching his conclusion about the T/R cell's age, Mr. Stakelum assumed that the cell was a VDX–1047S model. *See* Tr. III:74–75. He based this assumption on the notation on a June 1982 service report indicating that a VDX–1047S T/R cell was replaced. *See* Exh. P24(A). But as the serial number on that report, *compare, e.g.,* Exh. P24(A) *with* Exh. P24(D), the references to the Prora ARPA features, *see* Exh. P24(A), and the unobjected abstract for the report, *see* Exh. D3(35abstract), each confirm, that report concerned the 10–cm unit, and not the 3–cm unit. Thus, the Court finds that Mr. Stakelum's assumption was in error. According to Mr. Stakelum, none of the other service records mention a replacement of a T/R cell for the 3–cm unit. *See* Tr. III:77.

When the DIALA was in Venezuela on July 8, 1983, a service technician inspected the 3–cm unit and on a service report wrote: "antenna not rotating." *See* Exh. D3(47). When the DIALA returned to Germany at the end of the month, the antenna unit was replaced. *See* Exh. D3(49). Mr. Stakelum admitted that the top bearing for this antenna needed replacing. *See* Tr. III:87.

### E. *The proceedings*

Within ten days of the grounding, pursuant to the terms of both the CFSA and the bill of lading, *see* Exh. P1(30), clause 32, lines 385–386; Exh. P2, clause 5, line 72, Shell appointed a London adjuster, Wm. Elmslie & Son, to issue a general average statement. *See* Exh. P29(II)(B). Correspondence between Shell and Placid reveals that Shell kept Placid advised of the progress of the general average adjustment. *See* Exh. P29(II)–(III). In November 1983, on a preliminary finding of the salvage expenditures and of the value of the cargo and the vessel, the adjuster requested that Placid make a $1 million deposit toward the general average claim. *See* Exh. P29(III)(F). Placid declined. Finally, on February 18, 1986, the adjuster issued its statement. *See* Exh. P28.

On August 28, 1986, Deutsche Shell commenced this action against Placid in the federal district court in Houston. Thereafter, that court transferred the action to this Court under 28 U.S.C. § 1404(a).

## II.

This Court has subject matter jurisdiction under 28 U.S.C. § 1333(1). Because Placid is doing business in this district, the Court has personal jurisdiction over Placid and venue is proper in this district.

■ Because the complaint asserts an admiralty claim within the meaning of F.R. Civ.P. 9(h), federal maritime law governs. While both the CFSA and the bill of lading provide for English law to govern, neither party presented any evidence or argument that the Court should apply English law or that applicable English law differs from federal maritime law; indeed, both parties appear to presume that federal maritime law applies. Thus, the Court applies federal maritime law. *See Clarkson Co. v. Shaheen,* 660 F.2d 506, 512 n. 4 (2d Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982); *cf.* F.R.Civ.P. 44.1; *McGhee v. Arabian American Oil Co.,* 871 F.2d 1412, 1424 n. 10 (9th Cir.1989) (court not required to research foreign law on its own initiative).

### A. *Laches*

Shell filed this lawsuit within 3¼ years after the grounding and subsequent cargo delivery in June 1983. Placid argues that the Court need not address the merits of the general average dispute because, in Placid's view, the Court may dismiss the entire case on the maritime doctrine of laches.

■ The right to general average contribution accrues and becomes enforceable, at the latest, when the ship arrives at its port of destination and delivers its cargo. *United States v. Atlantic Mutual Co.,* 298 U.S. 483, 490, 56 S.Ct. 889, 891, 80 L.Ed. 1296 (1936). For non-personal injury maritime time actions, *cf.* 46 U.S.C.App. § 763a (eliminating laches for personal injury mar-

itime actions), the law is well-established in the Fifth Circuit:

> Laches is an equitable doctrine that, if proved, is a complete defense to an action irrespective of whether the analogous state statute of limitations has run. As interpreted by this court, the analogy rules serves primarily to determine where rests the burden of proof. When a plaintiff filed a claim in admiralty within the analogous statutory period, defendant must show inexcusable delay and resulting prejudice in order to establish a laches defense. Where ... the statute has run prior to instituting suit, the plaintiff must prove either absence of prejudice or excuse for delay to repel a claim of laches.

*Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1215 (5th Cir.1980); *accord Barrios v. Nelda Faye, Inc.*, 597 F.2d 881, 885 (5th Cir.1979). Many courts addressing this defense for a general average claim have looked to the forum State's limitation statute for general contract actions to determine the analogous limitation period. *See, e.g., A. Bottacchi S.A. v. Philipp Brothers Latin America Corp.*, 410 F.Supp. 375, 377 (S.D.N.Y.1976); *Liman v. India Supply Mission*, 381 F.Supp. 368, 370 (S.D.N.Y.1974); *cf. Argyll Shipping Co. v. Hanover Insurance Co.*, 297 F.Supp. 125, 127–28 (S.D.N.Y.1968).

Because this action was transferred from Texas under 28 U.S.C. § 1404(a), the issue arises whether this Court should look to Louisiana's 10–year prescriptive (limitation) period for contract actions, *see* LA.CIVIL CODE art. 3499, or instead to a Texas limitation period. *Cf. Ferens v. John Deere Co.*, 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (transferee court under 28 U.S.C. § 1404(a) must apply the choice-of-law rules of the transferor court). Further, if Texas provides the appropriate state law for analogy, the further issue arises whether this Court should look to the 4–year period for certain contract actions, *see* TEX.CIV.PRAC. & REM.CODE § 16.004 (Vernon 1986) (formerly TEX.REV. CIV.STAT. art. 5527(1) (Vernon 1958)), or instead to the 3–year period for carriers' actions for compensation or hire, *see id.*

§ 16.006 (formerly TEX.REV.CIV.STAT. art. 5526b (Vernon Supp.1960)).

▆ The Court need not resolve these novel issues: even assuming that the three-year period applies so that Shell bears the burden of proof, the Court finds that Shell has met this burden.

In its memoranda, Placid suggests that, because of the delay in the adjuster's not issuing its final report until February 1986, several potential witnesses became unavailable for various reasons; Placid further suggests that Shell abused the discovery process by providing documents and witness names well after court deadlines. On the one hand, while the delay may seem long for a single-cargo general average case, Placid introduced no evidence to substantiate the former suggestion or to show that Shell itself was at all responsible for the delay. On the other hand, the Court extended the taking of discovery and perpetuation depositions to cure any undue prejudice to Placid from Placid's having inadequate time to conduct discovery.

The sole evidence at trial about missing records was brief testimony from Captain Schätzel that Shell had apparently destroyed the DIALA's telex/communications files, at least for the period at issue here. *See* Tr. I:70, II:12. On the one hand, pertinent telexes to or from the DIALA were obtained from other sources. *See* Exh. P4(1)–(2), P8, P9, D1(A)–(M). On the other hand, the legal effect to be given any improper record keeping is best considered on the *merits* of the issue whether Shell has established that it exercised due diligence in making the DIALA seaworthy.

Other than this minor evidence about the telexes, Placid presented no evidence on the issue of laches. By contrast, Shell showed that Placid was kept informed of and made inquiries about the progress of the general average adjustments. Noting further that Shell brought this action within seven months of the date when the contractually-required general average statement was issued, the Court concludes that Shell has presented sufficient evidence to

meet any burden of proof it may face on laches.

In sum, the Court disagrees that it should apply laches in this case to bar it from *even considering* Shell's claim. Thus, in its discretion, the Court concludes that Placid's laches defense should fail.

### B. *General Average*

■ Often complex in application, the rules for determining general average liability may nonetheless be summarized in three simple steps—at least here, with the York/Antwerp Rules 1974, *reprinted in* 2 BENEDICT ON ADMIRALTY § 181, at 13–1 to 13–12 (7th ed. 1990); COGSA, 46 U.S.C.App. §§ 1300–1315; the standard New Jason Clause; and a single cargo load. First, the vessel owner has the initial burden to establish a general average act and the existence of a separate cargo owner at the time of the general average act. Second, if the vessel owner meets this initial burden, then the cargo owner may defeat the general average claim by establishing that unseaworthiness of the vessel at the start of the voyage was a proximate cause of the general average act. Third, if the cargo owner meets this second burden, then the vessel owner may still succeed if it nonetheless establishes that it had exercised due diligence to make the vessel seaworthy at the start of the voyage. *See Atlantic Richfield Co. v. United States*, 640 F.2d 759, 761–62 (5th Cir. Unit A 1981); *see also Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 1321, 1330 (5th Cir.1987); *Orient Mid–East Lines, Inc. v. A Shipment of Rice*, 496 F.2d 1032, 1037–39 (5th Cir.1974), *cert. denied*, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975). *See generally* BENEDICT ON ADMIRALTY §§ 181–188; G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY ch. 5, at 244–71 (2d ed. 1975); 1 A. PARKS, THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE ch. 17, at 513–53 (1987); L. BUGLASS, MARINE INSURANCE AND GENERAL AVERAGE IN THE UNITED STATES ch. 6, at 175–313 (2d ed. 1981).

While the Court agrees with Shell that Placid owned the cargo at the time of the grounding, the Court does not find that

Shell established a general average act. Further, even assuming that the degrounding efforts had constituted a general average act, the Court finds that unseaworthiness of the DIALA at the start of its voyage from its defective 3–cm radar unit was a proximate cause of the grounding and that Shell failed to establish that it nonetheless had exercised due diligence to make the DIALA seaworthy before it left Sullom Voe.

#### 1. Placid's oil

■ Under Clause 9.(1) of the parties' CFSA, the parties effectively agreed that the terms of the CFSA would include the standard New Jason Clause, on general average contributions. Placid asserts that, at the time of the grounding, it neither owned the cargo nor bore the risk of its loss; thus, Placid argues that Deutsche Shell may not assert a general average claim against it.

The Court need not decide whether a shipowner may seek a general average contribution from a consignee of cargo where the consignee did not yet own the cargo at the time of the general average act and the shipowner released the cargo without having first obtained security from the consignee. Here, the Court concludes that, at the time of the grounding, Placid both owned the cargo and bore the risk of its loss.

This answer lies wholly in the terms of written documents between the parties, specifically, the CFSA quoted above in Part I(A). Guided by the general principle that it should construe all ambiguities against Shell as the drafter of the CFSA, the Court must determine the parties' objective intent in the CFSA. Had Fruin suggested a form of contract more typical for a single spot contract of carriage (such as a Shellvoy 4 voyage charterparty), there likely would have been no dispute over cargo ownership. Yet merely because another form of contract would have been more suitable, it does not follow that the parties' contract was necessarily unclear or unsuitable.

Pointing to Fruin's testimony, Shell suggests what effects arose because the load of cargo that Shell purchased FOB from

Placid under Clause 1.(1) was the same load that Placid purchased C & F from Shell under Clause 1.(2): first, under Clause 7.(1), the risk of loss for the cargo passed instantaneously from Placid to Shell Trading and back to Placid at the Sullom Voe terminal's discharge flange; second, under Clause 7.(4), title passed instantaneously from Placid to Shell Trading and back to Placid when the DIALA reached "400 miles outside of UK territorial waters"; and third, Clause 7.(3) thus had no bearing or effect in this instance. While affording Fruin's testimony in this regard no special weight inasmuch as the interpretation of the CFSA, including whether any ambiguities exist, is a matter of law, the Court agrees with his conclusions.

First, Shell's interpretation—that Placid owned the cargo and bore the risk of loss—follows the ordinary commercial conditions that, absent a specific agreement to the contrary, apply where a shipowner carries another person's cargo from one point to another: the other person remains the owner of the cargo at all times and must make general average contributions where and as appropriate.

Second, Shell's interpretation is consistent with the parties' prior dealings. On the one hand, Placid had always chosen to have itself, and not Shell, insure the cargo that it was to receive from Shell. On the other hand, the parties made no express change in their CFSA terms to indicate a different intent in their May 1983 contract.

Third, Placid ignores the commercial understanding of the terms "FOB" (free on board) and "C & F" (cargo and freight). The terms "FOB [location]" and "C & F [location]" govern the terms for carriage *until* the cargo reaches the FOB or C & F location. Thus, the term "FOB Sullom Voe" here did not govern any terms of carriage *after* the cargo reached its FOB location (here, aboard the DIALA while at the terminal flange in Sullom Voe); by contrast, the term "C & F Port Allen" governed the terms of carriage of cargo to Port Allen from its point of origin. By suggesting that the cargo on the DIALA at the time of the grounding was not gov-erned by the "C & F Port Allen" term, Placid effectively would read out the source of Shell's contractual obligation to deliver any cargo to Placid at Port Allen.

Fourth, the CFSA form contemplates instances where as here Shell might do no more than merely deliver the same quantity of oil for a single customer from one location to another. Clause 6.(4)(ii) specifically describes this situation, as does as well Clause 3 in Appendix B. Thus, Placid's observation that Clause 1 in Appendix B lists Shell Trading as consignee is misplaced; that clause addresses only those instances under the CFSA form where unlike here Shell was to take oil into the "Shell System" not for direct delivery to Shell's same customer.

### 2. No General Average Act

With little more than a citation to York/Antwerp Rule A and the London adjustor's statement, Shell would have the Court gloss over the initial issue whether Shell's degrounding efforts constituted a general average act. Shell perhaps believes that the Court should find the existence of a general average act here merely because the DIALA was carrying millions of gallons of crude oil. The Court rejects this position and does not otherwise find circumstances sufficient here for the Court to conclude that a general average act occurred here.

As *Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc.*, 92 F.2d 41, 44 (2d Cir.), *cert. denied*, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937), shows, voluntary efforts at degrounding a vessel *may under certain circumstances* constitute a general average act. However, as the Fifth Circuit's opinion in *Orient Mid-East* indirectly shows, *see* 496 F.2d at 1038–39, and as Professors Gilmore and Black directly warn, *see* GILMORE & BLACK § 5–6, at 255, the Second Circuit's opinion cannot be read too broadly as establishing a *per se* rule, or even just a rebuttable presumption, concerning efforts to deground a vessel. Each case must turn on its own facts. *See ibid.*

Shell did not establish that, after it grounded, the DIALA lay in a navigable

channel in the river or in any danger of being struck by another vessel traveling on the river or constituted an unreasonable obstruction to navigation, *cf. Pillsbury Co. v. Midland Enterprises, Inc.,* 715 F.Supp. 738, 761–62 (E.D.La.1988) (Carr, J.) (an object merely present in the Mississippi River is not presumed to be an obstruction), *aff'd,* 904 F.2d 317, 318 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990), or that the position in which the DIALA grounded was such that the river's current alone might possibly cause an oilspill or other damage to the DIALA and/or the cargo. Indeed, in his June 9th letter to the Coast Guard, Captain Schätzel stated "there was absolutely no sign of any damage to the ship's hull and no sign of any pollution whatsoever." Exh. P11, at 2; *accord* Exh. P12, box 44; *see also* Exh. D8, at 2 ("The vessel went softly aground by the stern.... As far as I know the vessel was not holed and there was no pollution."); *cf.* 33 CFR § 160.215 (requiring that the Port Captain be notified of any "hazardous condition on board"). The sole testimony about any events after the grounding (other than the testimony about the two radar technicians' work) was Captain Schätzel's and Chief Officer Born's unelaborated testimony that each "was involved in the refloating operation." *See* Born:47–48; Tr. I:89.

The Court fully agrees that if this oil had spilled into the river, a catastrophe would have occurred. But Shell failed to establish that the chances of a spill were imminent and/or significant. In short, Shell failed to establish that the danger of an oilspill or other calamity after the grounding was "real and substantial" in this case. *Cf. Navigazione Generale,* 92 F.2d at 43.

In sum, Shell failed to establish, by a preponderance of the evidence, that both the DIALA and its cargo were in a position of sufficient "peril" necessary for the Court to find that the degrounding efforts constituted "extraordinary ... expenditure[s]." *See Orient Mid–East,* 496 F.2d at 1038–39. The Court concludes there was no general average act.

### 3. Proximate cause of grounding

█ Within the same day, both radars had, suddenly and without explanation to anyone aboard, failed on this huge vessel carrying millions of gallons of crude oil. When the second radar failed, the DIALA nearly collided with a downbound barge in a blinding squall common for June-time around New Orleans. The general weather remained rainy after this *in extremis* encounter.

Pilot Lahners thus faced two choices. On the one hand, he could have the DIALA proceed up the curving river through the night with no reasonable certainty that the crew's interswitching the antenna for one radar unit with the display panel for the other had solved the radar problem and would give the DIALA a single wholly reliable radar system for the remaining several hours it would take to reach Port Allen. On the other hand, notwithstanding the river's fast current (the effects of which, as common sense tells and cases have shown, increase as a vessel proceeds with less engine power such as occurs when the vessel is coming to anchor, *see, e.g., East–West Towing Co. v. National Marine Service, Inc.,* 417 F.2d 1274 (5th Cir.1969) (per curiam)), he could have the DIALA anchor to have all its radars checked and fixed by an expert radar technician. In other words, Pilot Lahners had to weigh the risks associated with non-functioning radar against the risks associated with anchoring and generally with any vessel's not being under its own full steering control.

Neither Pilot Lahners nor any of the DIALA's crew knew exactly why either radar unit had failed, *see, e.g.,* Tr. I:79–80; IV:51, 137, or had any technical training or expertise in radar equipment; no one on the DIALA could be reasonably sure that the crew's interswitching—which no crewmember had ever attempted before—had cured the unexplained failures and subsequent problems, even if the interswitching initially appeared successful to Captain Schätzel, Chief Officer Born, Pilot Lahners, or any of the other, non-expert users on the DIALA. Thus, the Court finds that Pilot Lahners was reasonable in not depending

on the crew's promises of a fully functional radar and in choosing to anchor—in believing, in effect, that the risks of anchoring (which include the risk that the vessel may drift out of control from the fleeting area) would be less than the risks of proceeding forward.

Indeed, at the time, Captain Schätzel himself must not have considered Pilot Lahners's choice a wholly unreasonable one, even if one that he (Captain Schätzel) acting alone might not have chosen: while he specifically advised Pilot Lahners that he believed the risks of anchoring to be greater than the risks of proceeding, *see* Tr. I:57; II:13–15, Captain Schätzel nonetheless chose to follow Pilot Lahners's recommendation, *see* Tr. I:91, apparently without further discussion or issue. As further corroborative evidence that Pilot Lahners was aware of the risks in stopping in the anchorage, the Court notes Pilot Lahners's testimony that a swift current can drag a vessel at anchor, *see* Tr. IV:35 (and perhaps Captain Schätzel's testimony that Pilot Lahners directed the use of two anchors for the very process of coming to rest, *see* Tr. I:59).

Nor was Pilot Lahners's decision an unforeseeable one. On the one hand, the DIALA was required under 33 CFR §§ 164.35(a) and 164.37(a) to have two functional, wholly independent radar systems while in U.S. waters. On the other, the Mississippi river's fast current that June 5th was not a sudden, unexpected and unpredicted phenomenon that could not have been verified before the DIALA set off from Sullom Voe, just as Shell's New Orleans agent had verified to Shell the river's controlling safe arrival draft; nor was there any suggestion that the squall was an unusual occurrence, at least for the

New Orleans area in June. The river's fast current "only heightened [Shell]'s duty" to make the DIALA seaworthy so that the DIALA might not have to stop unnecessarily in that fast current. *Cf. Humble Oil & Refining Co. v. Tug Crochet*, 422 F.2d 602, 608 (5th Cir.1970).

Citing 33 CFR § 164.53 and the Coast Guard's mystery telex, Shell suggests that as long as one radar system was operating, the DIALA was permitted to proceed. This observation answers the wrong question. First, even when the Coast Guard's port captain authorizes movement, that regulation still leaves it to the discretion of the compulsory river pilot, as "the person directing the movement of the vessel," whether to proceed. Second, the issue here is not whether Pilot Lahners was, or even whether he thought he was, legally compelled to seek anchorage, but rather is whether a person could reasonably anticipate that radar failures of the sort here on the one hand and fast river currents on the other might each be a factor that a compulsory river pilot would weigh in considering whether to anchor. In other words, the question before the Court is not whether it would have been reasonable to choose to proceed up the river, or whether the interswitching had in fact made one radar fully functional, or whether, if he had the benefit of hindsight, Pilot Lahners would have assessed greater risks of anchoring in that case.[12]

In summary, Pilot Lahners directed that the DIALA anchor at LaPlace *precisely because* the DIALA's two radars had failed, and the risk of grounding was directly related to this decision to anchor. Thus, the Court concludes that the failure of the DIALA's two radars was a proximate cause of the grounding.[13]

12. Read alone, Pilot Lahners's penultimate answer on his direct examination, *see* Tr. IV:34–35, might appear to suggest that, before the attempted anchoring, Pilot Lahners believed there would be no risks whatsoever in seeking to anchor. The Court rejects any such inference. First, his answer was somewhat ambiguous. Second, in the next question-and-answer, *see* Tr. IV:35, Pilot Lahners acknowledged that vessels in swift currents can drag their anchors. Third, Captain Schätzel testified that he specifically

told Pilot Lahners about the risks of anchoring. *See* Tr. I:57; II:13–15.

13. At least between the time the second radar failed and the interswitching was completed, the DIALA was operating in violation of both 33 CFR §§ 164.35(a) and 164.37(a) by not having any functional radar system at the time; further, these regulations were designed in part to help prevent some of the very events that occurred here (e.g., travelling blind in the river).

Shell argues that an old Supreme Court maritime case—*The Malcolm Baxter Jr.*, 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928)—compels a contrary conclusion here as a matter of law. This Court disagrees. In *Baxter*, the vessel developed leaks from unseaworthiness and thus went to a port of refuge to effect repairs; during the repair time, a general embargo was imposed. The Supreme Court held that *that* embargo and the ensuing delay from that embargo were not foreseeable consequences of, and thus not proximately caused by, the vessel's unseaworthy condition *n that case. Cf. The Mariner*, 17 F.2d 253, 254 (5th Cir.1927) (where a squall is not "an extraordinary event," its occurrence is not considered an intervening cause and thus does not prevent a vessel's pre-existing unseaworthy condition from being a proximate cause of any ensuing damage). Recent cases continue to adhere to the general principle of foreseeability on the issue of proximate causation, upon which *Baxter* relies. *See, e.g., Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447 (5th Cir.) (oilspill property damage suffered about 70 miles from the offending vessel was not reasonably foreseeable), *reh'g en banc denied mem.*, 875 F.2d 858 (5th Cir.), *cert. denied sub nom. Lucas v. Lloyd's Leasing Ltd.*, — U.S. —, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989).

In *Baxter*, there was no suggestion, and more importantly nor factual finding, that the risk of embargo was at all foreseeable in that case. *See Baxter*, 277 U.S. at 334, 48 S.Ct. at 519. By contrast, there always is, or at least here was, the risk of uncontrolled drifting in an attempt to anchor midstream in the Mississippi. Thus, in contrast to *Baxter*, the ensuing harm here (a grounding) was a foreseeable consequence of the offending condition here (unseaworthiness of the DIALA from its non-operable radar units)—as the Court explained more fully above.

### 4. Failure to make seaworthy

Having determined that the unseaworthiness of the DIALA from the radar failures was a proximate cause of the grounding, the Court now turns to the main issue on which the parties concentrated: what caused these failures, and could Shell have reasonably avoided them through actions before the DIALA left Sullom Voe.

Placid urges two general points: first, that Shell overloaded the DIALA for travel up the Mississippi River and thus is responsible for the vibration that caused the 10–cm radar unit to fail; and second, that Shell's improper maintenance practice contributed to the failure of each radar unit. The Court rejects Placid's first point and its second point as to the 10–cm radar unit; however, the Court accepts its second point as to the 3–cm radar unit.

#### a. *The arrival draft*

■ While not certain how or why, both Captain Schätzel and Chief Officer Born believed that the vibration at least contributed to the 10–cm radar unit's failure. *See* Tr. I:80; II:11; Born:75. Neither party presented any expert testimony on this point. Noting the contemporaneous relationship between the vibration and this failure, the Court accepts these officers' common belief.

Placid's burden of proof is, however, greater: not only must it prove that the vibration was a cause-in-fact of the 10–cm unit's failure, but also it must prove that the failure was proximately caused by an unseaworthy condition that existed when the DIALA left Sullom Voe. Placid contends that Shell overloaded its vessel by failing to account for the additional distance the DIALA drops, or squats, into the water when it is proceeding up a shallow river.

Through telex communications from its New Orleans agent shortly before the voyage, Shell learned, and advised the DIALA's crew, that the Bar Pilots were recom-

Thus, one might argue that the *Pennsylvania* rule applies here, imposing on Shell the staggering burden to prove that no possibility whatsoever exists that the radar failures had any causal connection with the grounding. In light of its

findings above, the Court need not determine whether to apply this rule. *Cf. Director General of India Supply Mission v. S.S. Maru*, 459 F.2d 1370, 1375 (2d Cir.1972), *cert. denied*, 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973).

mending a 39–foot arrival draft for safe passage up the Mississippi from Southwest Pass. The evidence is uncontradicted that the DIALA met this recommendation. While the DIALA's crew did not directly measure the DIALA's actual draft at or near Southwest Pass, see Tr. II:6, there was no evidence that Chief Officer Born's calculations may have been in error.

Placid brought out uncontradicted testimony that the clearance between the DIALA's keel and the river bottom should be at least two or three feet, see Tr. I:73; III:29–30; Thrun:65–66; Born:71, 113–114, and that Shell never sought to learn what the river's "controlling depth" would be during the voyage, see Tr. I:72; III:30; Thrun:65. Further, Captain Schätzel explained that the DIALA's draft drops, or squats, into the water around two more feet from its calm-water draft, when it is travelling around 11½ knots up the shallower portions of river. See Tr. II:9–10. From a review of the 3:13 and 4:33 entries for June 5th in the DIALA's movement book, see Exh. P6, at 14 (showing that the vessel travelled 14 miles in these 80 minutes), the Court determines that the DIALA was in fact travelling around this speed at the time of the vibration; thus, because vibrations indicate shallow waters, the Court concludes that the DIALA had a travelling draft of 41–feet at the deepest at that time.

But this conclusion is not enough. The characteristics of squat are not peculiar to the DIALA. See, e.g., United States v. Soriano, 366 F.2d 699, 702 (9th Cir.1966); Universal Tankships, Inc. v. United States, 388 F.Supp. 276, 287 (E.D.Pa.1974), aff'd, 528 F.2d 73 (3d Cir.1975). Thus, the Court ought not presume, without more, that the Bar Pilots do not already account for the effects of squat when they recommend a particular arrival draft. Cf. In re Lloyd's Leasing Ltd., 764 F.Supp. 1114, —— (S.D.Tex.1990). Yet Placid never in-

troduced evidence of what the controlling depth actually was or that, for the time of the DIALA's voyage, the maximum safe arrival draft for vessels of the DIALA's size should have been any less than 39–foot fresh-water.[14]

In sum, Placid failed to establish, by a preponderance of the evidence, that the DIALA was unseaworthy when it left Sullom Voe by carrying too much cargo. See Soriano, 366 F.2d at 702. With this final conclusion, the Court may pretermit the issue of due diligence. But the Court adds one point: while vibrations similar to the one felt on the DIALA are common, there was no showing that they had ever affected either radar unit before or that Shell should have foreseen this possible effect of vibrations on either unit.

#### b. The 10–cm radar unit

 The Court does not determine whether the 10–cm radar unit, and specifically, its printer circuit board (PCB) at issue here, was defective at the start of the DIALA's voyage. Even assuming it was, the Court concludes that Shell met its burden to establish that it exercised due diligence as to the 10–cm unit.

Because there was no evidence about the average life expectancy of any PCB components, there is also no basis to infer that the 10–cm radar unit's PCB at issue here may have been approaching or may have exceeded any maximum or minimum average life expectancy. The record contains no evidence that the relays or any other components in the PCB at issue here had ever malfunctioned before on the DIALA, that the malfunctioning of other components in the 10–cm unit might cause damage to this PCB, or that anyone at Shell disregarded any manufacturer's recommendations about PCBs. The operator's manual is wholly silent on scheduled, periodic inspections of this or any other PCB; further, there appears no practice among ra-

---

**14.** Conversely, however, the Court rejects the inference from Pilot Lahners's testimony ("At the time in question it was not uncommon for us to handle forty or forty-two feet of drafting up the river," see Tr. IV:40) that a draft of anything more than 39–feet fresh-water was reasonable for the portion of the river near South-

west Pass on June 5th. On the one hand, as a NOBRA, Pilot Lahners did not work this lower portion of the river. On the other, the Bar Pilots, whose jurisdiction covers this lower portion, had recently reduced their recommended safe arrival draft to 39–feet. See page 775 above.

dar technicians, on whom shipowners such as Shell must rely, for ensuring that PCBs are tested on any regular basis. While the manual gives instructions for ad hoc preventive maintenance of PCBs in general, these instructions appear to be directed to these expert radar technicians, and not the end-users such as the DIALA's crew. The evidence suggests that, at most, a radar technician inspecting near a PCB before an actual PCB failure might by random chance find possible signs of foreseeable trouble in the PCB and thus be able to prevent this possible trouble.

Thus, while rejecting on the evidence here Shell's suggestion that radar technicians were physically incapable of inspecting the relays in this PCB before any failure, the Court finds no basis for concluding that radar technician should have nonetheless inspected this PCB beforehand. Perforce, then, Shell cannot be held responsible for any failure to inspect these components before the DIALA's voyage from Sullom Voe.

#### c. *The 3–cm radar unit*

■ The Court concludes that the 3–cm unit failed for two reasons: first, from water incursion into the antenna/waveguide components of the unit from Shell's improper maintenance; and second, from the T/R cell's having reached its actual useful life capacity, which far exceeded either T/R cell type's average maximum life expectancy. The Court further concludes that Shell failed establish that it had exercised due diligence to avoid these unseaworthy conditions before the start of the DIALA's voyage from Sullom Voe.

It was undisputed that the 3–cm unit's T/R cell had become defective. Noting testimony that water in the radar unit does not damage the T/R cell itself, Shell would have the Court find that the T/R cell failure was the sole cause of the 3–cm unit's failure. The Court determines that Mr. St. Romain's own interpretation about his own factual findings is more credible and deserves more weight than Mr. Stakelum's second-hand interpretation of Mr. St. Romain's findings: the Court finds that water incursion into the antenna/waveguide com-

ponents of the 3–cm unit was a contributing cause of the 3–cm unit's failure.

First, the symptoms described by those aboard the DIALA best match those of water incursion. On the one hand, the white dot that appeared on the screen just before the 3–cm unit failed is indicative—if not perhaps most indicative—of water's being the radar antenna's waveguide. On the other hand, the weak picture that Captain Schätzel described is also indicative of water intrusion; the only other cause of a weak picture, according to the evidence presented, is from a defective magnetron, but there was no evidence or suggestion of any defective magnetron here. In other words, T/R cell failures alone apparently do not cause weak pictures on the display screen.

Second, the first radar technician to look at the radar system in daylight hours, Mr. St. Romain, found evidence of water in the scanner. While Mr. Kempf had noted no water earlier, he was inspecting the system during nighttime hours; further, his entire time on the DIALA was under 2½ hours, and much if not most of that time was spent at the 10–cm radar unit and at the 3–cm MTR unit. While Mr. St. Romain found only "slight" evidence of water, the effects of evaporation may explain the absence of more water; further, Mr. St. Romain, who to stress again works in New Orleans' rainy climate, testified that very little water in the waveguide can at times cause radar failure. In the face of the considerable other evidence, Shell's theory that the water Mr. St. Romain found came from Mr. Kempf's inspecting the antenna is too speculative for the Court to accept. Shell notes that the MTR components most susceptible to damage from standing water—that is, the magnetron and modulator—were undamaged here. As both experts explained, however, the harmful effects from water are not merely from its coming into physical contact with the MTR components, but also—and primarily—from its acting as an unwanted reflector higher up inside the antenna/waveguide components. Shell failed to establish that any water that enters any portion of these up-

per components will necessarily travel the circuitous route down into the MTR unit.

Third, Mr. St. Romain found the 3–cm display better after he inspected the antenna and waveguide and, the Court infers, cleaned out the small amount of water he had found. Shell failed to explain how a radar display's picture can improve from work on the antenna if the unit's failure is solely from its T/R cell—why adjusting an antenna may improve the picture when the radar unit's sole problem is with its T/R cell.

Fourth, earlier repair records noted signs of rust and water ingress from a top bearing and—despite its repairman's having corrected any abnormal noises that may have earlier been present—recommended that this bearing be replaced as soon as possible, yet there was no evidence that Shell had had this condition corrected. While the manufacturer's operations manual recommends that the antenna be taken down and overhauled, and all ball-bearings be replaced, every two years, Shell did not follow this recommendation. Shell's own expert admitted that an overhaul before the voyage would have revealed the pre-existing decay in 3–cm unit's antenna. Further, the experts were in full agreement that bad bearings are one of the sources for water to enter the antenna and waveguide.

Fifth, Mr. St. Romain found the antenna cover was "in dire nee[d of] recoating" because it was "very porous" and thus could permit unwanted water ingress during a rainstorm, such as occurred the evening of the grounding. This poor condition, even Mr. Stakelum implicitly recognized, did not suddenly manifest itself after the DIALA left Sullom Voe.

The Court rejects Shell's efforts to focus solely on the period between the August 1982 drydock and the June 1983 grounding: the antenna was not overhauled during the drydock. While Mr. Pedersen apparently found no problems with the radar antennas and the DIALA's two radar units passed a German classification inspection, Shell did not specifically advise either person about the earlier documented water-related prob-

lems or about any other problems. Nor did Shell show that water ingress through a bearing is possible only when the antenna emits abnormal noises, *cf.* Exh. D3(6), or jiggles from "play in the bearings," *cf.* Pedersen:45. If a shipowner is to enjoy the safe harbor of an inspector's okay, the shipowner must show that it revealed sufficient facts to the inspector; Shell did not. Thus, the Court affords little weight to the lack of problems detected by Mr. Pedersen or the classification surveyor. *See Louis Dreyfus*, 830 F.2d at 1327.

Even if the Court were to conclude that water ingress was not a contributing cause of the 3–cm unit's failure, however, Shell would still not succeed in showing due diligence for the 3–cm unit's T/R cell failure. In other words, even as to the T/R cell failure, Shell failed to meet its burden to establish that its efforts, or lack of efforts, about radar maintenance constituted due diligence vis-à-vis the T/R cell.

Noting the absence of a contrary opinion, the Court accepts Mr. Stakelum's opinion that the 3–cm unit's klystron was not defective. Further, the Court accepts his opinion that the 3–cm unit's T/R cell failed because it finally reached its actual useful life. While the T/R cell apparently had some hours' useful life remaining when the DIALA left Sullom Voe, the evidence does not support a finding that anything unexpected during the voyage unforeseeably accelerated the T/R cell's demise. While lightning (which is certainly not uncommon in many rainstorms) may affect the newer T/R cell type, the record does not reveal evidence either of lightning or of which type of T/R cell was inside the 3–cm unit; thus, the Court cannot accept Mr. Stakelum's contrary presumptions.

The record contains no evidence that the 3–cm unit's original T/R cell from 1973 had ever been replaced at any time. By even the most favorable of Mr. Stakelum's estimates about the number of hours the DIALA had the 3–cm unit in use, the Court cannot reasonably infer that the T/R cell in the 3–cm unit on June 5th had not well exceeded either T/R cell type's average maximum life expectancy. Yet as the time

meter on the 10–cm unit shows and as both Mr. Stakelum's testimony and a principal policy behind having log books necessarily imply, a company—if inclined—can readily compute the number of hours a radar unit is in actual use and a service technician may change a T/R cell if, such as through log book entries or time meter readings, he knows that the T/R cell had already exceeded any average useful life. Noting on the one hand the strong testimony about maintaining radar logs and on the other the operator manual's specific mention of the newer T/R cell type's longer life, the Court does not accept the inference that industry custom among radar technicians is never to check a T/R cell that has manifested no possible problems, even if the cell has over 5000 hours of use. *Cf. also The T.J. Hooper*, 60 F.2d 737 (2d Cir.) (industry custom is not an absolute defense), *cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp.*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

Had Shell adopted a more thorough method for recording and relaying information about the radar units on its ships—had it required a written radar log for the DIALA and required that its captain or equipment officer first review this log whenever describing radar problems to a radar technician—then omissions such as occurred in the December 1982 quarterly report would likely have not occurred and the telling signs about the 3–cm radar unit's pre-existing conditions would likely have been detected and corrected. By relying in part on the inherent imperfections of word-of-mouth (as opposed to, to use the words of Placid's radar records expert, the "unemotional data" of a log book, *see* Tr. IV:74) and not following through with radar technicians' recommendations, Shell invited the surprises that occurred June 5th.

The Coast Guard and SOLAS regulations for two independent radar systems are designed to avoid a large ship's ever being completely blind. If one radar unit fails for some unpredicted, unpredictable reason, the other should be in a condition to serve as a reliable backup. By having one unit that was not up for the unexpected (namely, the 3–cm unit), Shall cannot look to innocent Placid even if the other unit's earlier failure was no one's fault.

### III.

For these reasons, the Court dismisses the entire action on the merits at the plaintiff's costs.